981 A.2d 1

**GIANT OF MARYLAND, LLC**

v.

**Julia M. TAYLOR.**

**No. 223, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 30, 2009.

2

4

Connie N. Bertram, Patricia A. Exposito (Winston & Strawn, LLP, on brief), Washington, DC, for Appellant.

William Ford, Camp Springs, Jo Ann P. Myles, Largo, for Appellee.

Panel: HOLLANDER, DEBORAH S. EYLER, and * FREDERICK J. SHARER, (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

Giant of Maryland, LLC ("Giant") appeals a judgment entered on a jury verdict in the Circuit Court for Prince George's County in favor of Julia M. Taylor, a former Giant employee, in an employment discrimination and retaliation case. After a seven-day trial, the jury found by special verdict that, during a particular time period ending on February 3, 2003, Giant discriminated against Taylor on the basis of her gender by requiring her to undergo an independent medical examination ("IME"). The February date was significant because that is when Taylor filed a discrimination charge against Giant with the Prince George's County Human Relations Commission. The jury further found, based on a retaliation charge Taylor filed against Giant on March 6, 2003, before the same body, that Giant had terminated her from employment for filing the February discrimination charge. The jury awarded Taylor $644,750 in compensatory damages.

---

* J. Frederick Sharer participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

Giant poses a plethora of questions for review. We find merit in three of them, and shall reverse the judgment on those bases. The first question, paraphrased, is whether the circuit court erred in denying various motions filed by Giant on the ground that Taylor's claims were preempted by federal law, specifically, by section 301 of the Labor Management Relations Act of 1947 ("the LMRA"), 29 U.S.C. section 185(a). The second and third questions are whether Giant's motion for judgment should have been granted on the ground that Taylor did not present legally sufficient evidence of a claim for discrimination or a claim for retaliation.[1] We answer all three questions affirmatively.

## FACTS AND PROCEEDINGS

In 1988, Giant, a large grocery store chain based in Landover, hired Taylor to work full-time as a truck driver (officially

---

1. These issues all are raised in Question I of the questions presented in Giant's brief. That question also asked whether the trial court erred in denying Giant's motion for judgment on liability based on the absence in the Prince George's County Code of a cause of action for retaliation. Given our disposition of this appeal, we need not address that issue; nor need we address Questions II, III, and IV, which as rephrased for clarity are:

 II. Did the trial court err by denying Giant's motion for judgment on damages made on the following grounds:
 • damages only could be recovered for the time period between Taylor's removal from the work schedule and her termination; and
 • lost earnings could not be recovered because Taylor failed to mitigate her damages?
 III. Did the trial court make the following evidentiary errors:
 • error in excluding evidence about the basis for Giant's decisions to request that Taylor submit to a fitness-for-duty examination by a specialist and to remove her from the schedule until she complied with that request?
 • error in admitting testimony of other drivers
 • error in admitting Taylor's "post hoc notes" of a meeting with Giant representatives prepared after Taylor had a motive to fabricate?
 IV. Did the trial court make the following errors in its instructions and in the verdict sheet:
 • error in failing to provide the jury with a proper verdict sheet?
 • error in refusing to give a jury instruction concerning Taylor's obligation to mitigate damages, and the essential elements of her discrimination and retaliation claims?

called a tractor-trailer driver), delivering products to Giant's stores in Maryland, Virginia, and Delaware. During her employment by Giant, Taylor was a member of the Teamsters Local Union 639, which has a collective bargaining agreement ("CBA") with Giant.[2] The CBA governed the terms of Taylor's employment.

The events pertinent to this case began in February 2002, when Taylor was 38 years old. The CBA required, in Article 15, that truck driver employees give Giant at least 1.5 hours advance notice if they were to be late or absent from work ("the call-in rule"). On February 1 and 27, and March 4, 2002, Taylor was late to work without complying with the call-in rule. In March 2002, under Article 10 of the CBA, Giant took disciplinary actions (verbal warnings) against Taylor for violating the call-in rule. Taylor filed grievances over those actions under Article 24 of the CBA.

A first step disciplinary meeting was held on March 29, 2002. It was attended by Taylor; Michael David, Taylor's shop steward;[3] and Pam Sanford, Giant's Director of Transportation, who was Taylor's direct supervisor. Taylor said she had been late because of a gynecological problem and brought a note from her doctor that stated that general reason. According to Taylor, she told David and Sanford that her problem was heavy bleeding upon menstruation, and that sometimes she did not have 1.5 hours between the onset of the bleeding and her work start time in which to give notice that she would be late or would be staying home sick. The Giant representatives thought the information Taylor provided did not explain why her gynecological problem would prevent her from complying with the call-in rule.

---

**2.** The CBA in effect at the relevant times covered the period from May 13, 2001, to May 13, 2006.

**3.** Under Article 5 of the CBA, shop stewards have the authority to investigate and present grievances to Giant; transmit information and messages relating to grievances; and "bring a grievance to [Giant's] attention at the time of occurrence."

On May 8, 2002, Taylor again was late to work without complying with the call-in rule. This time, Giant disciplined her by written warning. Taylor filed a grievance over that action, stating that she already had explained the problem.

In June 2002, Taylor applied for intermittent Family Medical Leave Act ("FMLA") leave so she could take a few days off each month for her gynecological problem.[4] Her application with supporting documents was submitted to Sharon Libby, Giant's Medical Management Coordinator. Dr. Jill Ladd, Taylor's gynecologist, certified in the supporting documents that Taylor had menorrhagia (heavy menstrual bleeding due to fibroid tumors in the uterus) that might cause her to miss work three to four work days per month. In response to a question asking about the expected duration of the condition, Dr. Ladd stated that the leave would be required until surgery was scheduled; the date of surgery was not specified. On behalf of Taylor, Dr. Ladd stated: "unable to fill out this form at this time—surgery is pending."

Taylor's FMLA application was approved the following month. Sanford was notified by Libby's office of the approval.

Also in July 2002, Taylor was placed in Giant's "Doctor's Certificate Program." This program, a term of the CBA, required any driver who had six or more "chargeable" absences within a nine-month period to be placed within the Program and provide a doctor's note for each absence.

It was Giant's position that, although Taylor now had FMLA leave to cover these intermittent absences from work, she still was required by the CBA to abide by the call-in rule, i.e., to give 90 minutes advance warning to Giant of an absence. Taylor thought otherwise, i.e., that now that she had FMLA leave, she was no longer bound by the call-in rule.

In August 2002, a second step grievance meeting was held. In addition to Taylor, that meeting was attended by Sanford; John Steger, the Secretary/Treasurer of Local 639, and Taylor's union representative; Dave Larson, Vice President of

---

4. Family Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.

Transportation; and Ted Garrett of Giant's Fair Employment Office.[5] Taylor was asked again why she was not able to give 90 minutes advance notice of lateness or absences, as required by the CBA. She responded that all of the information about that was in the paperwork supporting her FMLA leave application. No one in attendance at that meeting had seen that paperwork, however, and some of the people in attendance did not know that Taylor had a medical condition at all. After the meeting, Garrett obtained the FMLA paperwork, which stated that Taylor had uterine fibroid tumors and menorrhagia. According to the Giant officials involved in the disciplinary proceedings, there was nothing in the documents to explain why Taylor could not give 90 minutes advance notice of an absence.

In October 2002, Taylor again tried to use FMLA leave on a day when she was suffering from heavy bleeding, but was given a verbal warning for violating the "Doctor's Certificate Program." She complained to Sanford about not being allowed to use the FMLA leave for these situations, and Sanford relayed her complaint to Ellen Tilly, Administrative Secretary in Giant's Transportation Department. On October 20, 2002, in frustration over the situation, Taylor wrote a letter of complaint to Ann Weiser, Executive Vice President of Human Resources.

On November 8, 2002, a third step meeting was held about Taylor's grievances. Taylor again appeared with Steger representing her. The meeting was attended by Sanford, David, Larson, and Garrett. Also in attendance for the first time was Eric Weiss, Vice President of Labor Relations for Giant.[6] Weiss asked Taylor to sign a release for her medical records but she refused, out of privacy concerns. He then asked whether the Giant representatives could talk directly to Dr. Ladd about her medical problem. Taylor would not agree, as

---

5. While the record is unclear, there are some indications that Michael David and Phyllis Moore, Giant's Transportation Manager, also were there.

6. While the record is unclear, Moore also may have been in attendance.

was her right. (She had so agreed, however, in the FMLA application papers.) By the end of the meeting, the participants reached a compromise. Taylor agreed that if Weiss, on behalf of Giant, would write out the questions for Dr. Ladd to answer, she would have Dr. Ladd respond to them in writing.

Also, at that meeting, Garrett explained that Taylor's FMLA application needed to be updated, because, as filled out in June, it stated that some medical issues could not be answered because a decision about surgery had not yet been made by Taylor and Dr. Ladd.

On November 14, 2002, Weiss sent Steger a letter setting forth the questions Giant wanted Dr. Ladd to answer and stating that Dr. Ladd's response was needed by November 29, 2002. Steger sent the letter to Taylor, who took it to Dr. Ladd.[7] Taylor later asked Weiss for an extension of the response date; Weiss agreed to extend it until December 12, 2002. On December 9, 2002, Taylor was seen by Dr. Ladd. According to Taylor, in a letter dated December 11, 2002, Dr. Ladd responded to the inquiries; and Taylor took the letter to Weiss's office the next day, December 12. (Giant witnesses took the position that Dr. Ladd's letter was not received by Giant until December 30.)

---

**7.** The letter stated, in part:

[I]n order to resolve Ms. Taylor's grievances, we require documentation from Ms. Taylor's health care provider that responds to the following questions:

(1) Was Ms. Taylor physically incapable on March 4, 2002 and May 8, 2002 of providing Giant with 1.5 hours notice of her absences?

(2) If so, why?

(3) Will there be occasions in the future where Ms. Taylor's medical condition renders her physically incapable of providing Giant with 1.5 hours notice of her absence?

(4) If so:

(a) Why?

(b) How frequently will Ms. Taylor be rendered physically incapable of providing the requisite amount of advance notice?

(c) What is the expected duration of Ms. Taylor's physical inability to provide the requisite amount of advance notice?

(d) Given the answer to 4(a), how much advance notice will Ms. Taylor be capable of providing during the period referenced in response to question number 4(c)?"

On December 19, 2002, Taylor underwent her routine Department of Transportation ("DOT") physical examination. Ordinarily, for truck drivers like Taylor, the DOT physicals take place every two years. A gynecological examination is not part of a DOT physical. Taylor's DOT examination was performed by Dr. Joan Shapiro, one of several doctors approved by Giant to perform DOT physicals. Taylor passed the DOT physical and was given a valid DOT card that day. The card would be in effect for two years, until late 2004.

On December 24, 2002, Weiss wrote a follow-up letter to Steger stating that he had not received a letter response from Dr. Ladd, and accusing Taylor of not cooperating. The letter stated that Giant still was considering excusing Taylor from the call-in requirement, but needed further "medical documentation substantiating her inability to comply." Subsequently, Weiss gave Taylor another two weeks to furnish the information from Dr. Ladd. (As noted above, it was Taylor's position that Dr. Ladd had furnished that information in her letter of December 11, which Taylor had given to Giant the next day, December 12.) Weiss stated that, given the extension it had granted and the lack of information it had received, "Giant has no choice but to seek a second medical opinion concerning Ms. Taylor's ability to comply with the 1.5 hour call-in requirement, and the appropriateness and duration of her requested FMLA leave." Weiss furnished the name and contact information for "Kingstree Group," a physician practice group Giant had had experience with, and advised Taylor that "the examination must take place by January 7, 2003." If not, Giant would have "no choice" but to deny Taylor's grievances and her requests for FMLA leave.

Weiss acknowledges that, by December 30, 2002, he had received Dr. Ladd's December 11 letter.[8] The letter explained as follows Taylor's gynecological condition and why, in Dr. Ladd's opinion, she could not comply with the call-in rule:

---

8. The letter is dated "12/11/02" and is date stamped "RECEIVED DEC 30 2002 LABOR RELATIONS."

As previously indicated on [Taylor's] FMLA forms, she has a problem with menorraghia [sic] and uterine fibroids. On occasion she will suddenly start bleeding excessively. This can occur suddenly, with no warning and when she hemorrhages she is required to get off her feet and rest to decrease the bleeding. This has required her to miss work, including 3/4/02 and 5/8/02. Unfortunately, these symptoms can occur quite suddenly, making it impossible for her to predict when she will need to stay home from work, and the sudden onset can prevent her from giving the required 1.5 hrs. notice to her job, as was the case on 3/4/02 and 5/8/02. There may be occasions in the future requiring Ms. Taylor to miss work without knowing 1.5 hrs. beforehand. Some months the bleeding is manageable with routine activities, and some months it is not. She is currently trying different medical options to control this problem and if these fail, she will need to undergo surgery. To undergo major surgery is not a decision to be made lightly and is not unusual for my patients to try other therapies for 6–12 months before finally scheduling a date.

Upon receiving this letter, Weiss consulted with Josie Smith, Giant's Human Resources Manager for Distribution. According to Weiss and Smith, they both were concerned from the contents of the letter that Taylor's condition could pose a safety risk, for example, that she could experience a sudden hemorrhage and become incapacitated while driving a truck. Smith met with Bill Johnson, a Labor Relations Manager and Fleet Safety Officer who worked with Weiss, and they reviewed the relevant provisions of the CBA and the DOT regulations. Johnson advised that they gave Giant the right to require Taylor to submit to an IME, to demonstrate that it was safe for her to drive.

Smith and Johnson reviewed Taylor's DOT medical file, which included the information about her most recent, December 19, 2002, DOT physical. The form that she completed for that examination required her to disclose "[a]ny illness or injury in last 5 years" and to certify that her answers were "complete and true." Taylor did not include anything about

the sudden excessive bleeding condition that Dr. Ladd talked about in her letter. According to Taylor, however, she told Dr. Shapiro about the status of her fibroid tumors, which Dr. Shapiro was aware of. Taylor's DOT medical file showed that she had undergone surgery in 1995 for a fibroid tumor and had taken a substantial period of time off for recovery.

Taylor did not present herself for an IME on January 7, 2003, the date conveyed in Weiss's December 24, 2002 letter. Smith rescheduled the IME for Taylor with Dr. Janet Kennedy, a gynecologist at Kingstree, for January 23, 2003. On January 14, 2003, Kingstree sent a letter to Taylor, which she received, informing her of the new IME date.

Before the January 23 IME date, Taylor wrote to Steger questioning whether Giant could require her to attend the IME it had scheduled with Dr. Kennedy. On January 22, 2003, Weiss told Steger that Taylor was expected to attend the upcoming IME, and that it was Giant's position that, under Article 22.7 of the CBA, it had the right to require her to undergo an IME. Steger and Taylor spoke thereafter, and he told her that Giant was entitled to require her to undergo an IME under Article 22.7 of the CBA, and that she should attend.

Taylor did not attend the scheduled January 23, 2003 IME. She called to inform Kingstree she could not attend and, when asked for a date to reschedule, said she would not be available until April. Smith called the Kingstree Group and learned of this. Because she remained concerned about Taylor's fitness for work, she decided to contact another gynecologist, Dr. Michael A. Ross, to see if he would give a second opinion about Taylor's gynecological condition based upon the medical records that Giant had, without examining her. (Dr. Kennedy would not do so.) Dr. Ross agreed.

Also, during this period of time, from late December 2002 to January 28, 2003, Taylor was on "light duty," and was not driving, because she had sustained a knee injury at work. Taylor testified that, as these events were unfolding in January 2003, she felt "devastated" and that it was "inevitable"

that she was going to lose her job, because the "incidents" would accumulate, as she would continue to rack up violations of the call-in rule.[9]

On February 3, 2003, Taylor filed a charge of discrimination, based on race and gender, with the Prince George's County Human Relations Commission. She challenged the earlier disciplinary proceedings against her, and Giant's request for her medical records and its requirement that she undergo an IME. Her charge stated in relevant part:

> On November 8, 2002, Management decided that the medical documentation used to initially approve my FMLA was now not adequate. I was forced to provide additional medical documentation and they are now saying I have to undergo further testing with their doctors. Other employees (Male, White) are not similarly treated.

A notice of the charge of discrimination was mailed to Ted Garrett, and was received by him on February 7, 2003. There was no proof offered by Taylor that anyone else at Giant who was involved in her disciplinary or FMLA situation was aware of the February 3, 2003 discrimination charge on or before February 28; the Giant witnesses, including Smith, testified that they did not learn that Taylor had filed a discrimination charge until later in March 2003.

On February 13, 2003, Dr. Ross gave Giant's attorneys an opinion letter about Taylor's gynecological condition and fitness to drive. He opined that menorrhagia can cause anemia, which can cause dizziness. Based on the contents of Dr. Ross's letter, Smith decided that she needed to meet with Taylor in person to urge her to undergo the IME.

---

9. Taylor testified that she thought she had been disciplined after June of 2002 for violations of the call-in rule, but she could not recall when. The Giant documentation showed that, after June 2002, there was no disciplinary action taken against Taylor for violating the call-in rule. The grievance meetings that had been held all were a result of her violations of the call-in rule in February, March, and May, 2002. As noted above, the October 14, 2002 disciplinary action was for failure to comply with the Doctor's Certificate Program, not for violation of the call-in rule.

That meeting took place on February 28, 2003. Taylor was told that the meeting was going to take place when she returned from driving a 12–hour shift. Taylor and Smith had not met before. In addition to Taylor and Smith, the meeting was attended by David and by Nick Galyean, Corporate Fleet Safety Officer. Smith told Taylor that Giant was concerned that she could not drive safely due to her fibroid condition. Taylor was "startled" by that statement. When Taylor seemed upset about talking about her condition, Smith asked the two men at the meeting to leave for a while, so she and Taylor could speak privately.

According to Taylor, after the men left the room, Smith told her that she would have to undergo an IME by a gynecologist selected by Giant, and if that gynecologist recommended a hysterectomy, she would have to undergo that operation before she could be "rehired," and it was not certain that she ever would be "rehired." Smith told Taylor that the IME had been rescheduled for March 7, 2003, and that she would be taken off the work schedule until the IME was performed.[10] After ten minutes, the two men rejoined the meeting. According to Taylor, she felt based on what had transpired at that meeting that she effectively was fired from her job with Giant that day. Apparently, Taylor stopped going to work. She applied for and was granted unemployment benefits.

On March 6, 2003, Taylor filed a retaliation charge against Giant with the Prince George's County Human Rights Commission. She alleged:

> I believe that [Giant] has retaliated against me for filing a Title VII based complaint by terminating my employment because:
>
> On February 3, 2003, I filed a discrimination complaint. On February 28, 2003, I was terminated from my employment. I was told by the Human Resources Representative [Smith]

---

10. According to Smith, in the ten minutes that she and Taylor met privately, there was no discussion of the sort, except Smith informed Taylor that she would be taken off the work schedule until the IME was performed.

that I was terminated until I took a Physical. I explained to the Respondent [sic] that I just had a Physical in December 2002(DOT). The Representative stated that I was a safety risk and that is why I was being taken off the road.

I believe that [Giant] has taken this action to further discriminate against me in retaliation for filing the previous Title VII complaint.

As mentioned above, the IME appointment with Dr. Kennedy had been moved to March 7, 2003. Taylor did not attend because she considered herself a "terminated employee." Thereafter, on March 13, 2003, Smith wrote to Taylor stating that she had not been discharged on February 28, 2003, contrary to what Taylor was telling people. Smith set forth the expert opinion Giant had received from Dr. Ross, and wrote:

> According to [Dr. Ross], severe and sudden bleeding could very well cause anemia, which in turn could result in weakness and dizziness that would pose a safety risk to yourself and others. [Dr. Ross] recommended that an independent medical examination be performed in order to determine whether the severity of your condition poses a safety risk. In addition, an opinion is necessary to assess whether and how often you will be unable to call in 1.5 hours prior to the start of your shift, and to validate and update the information in your FMLA medical certification form. For these reasons, we scheduled an appointment for you with Dr. Kennedy on March 7, 2003.

> \* \* \* \* \* \*

> It is also my understanding that you failed to attend the examination that we scheduled for you with Dr. Kennedy on March 7, 2003. It is imperative that you contact me immediately ... concerning the reason for your failure to attend the examination. In addition, you must ... reschedule the examination and complete the examination by March 28, 2003. If you fail to schedule or attend the examination as instructed, you will be subject to immediate discharge.

By letter on March 15, 2003, Taylor responded to Smith, stating that she had been terminated from her employment with Giant and therefore would not undergo an IME. On March 25, 2003, John D. Catlett, President of Local 639, wrote to Taylor, explaining that she had not been terminated from her employment with Giant as of that date, recounting a conversation they had had on March 7, 2003, in his office, and memorializing the advice he claimed to have given her that day. He had told her that the CBA gave Giant the right to take her off the work schedule until she took a physical, and had recommended that Taylor comply with the request for an IME and then grieve the issue whether there was sufficient evidence to support Giant's IME request. At trial, Catlett testified that he did not know during that March 7 conversation that the IME being requested was a gynecological examination, as opposed to a standard DOT physical.

On April 23, 2003, after Taylor had failed to attend the scheduled IME or to come to work, Smith wrote to Steger, informing him that Taylor was discharged from employment with Giant. Smith stated that the reason for Taylor's termination was "her failure to obey a direct order as set forth in *Article 10 section 1 and Article 22 section 7* of the Collective Bargaining Agreement." (Emphasis in original.)

Taylor filed a grievance under the CBA of her termination, which she contended occurred on February 28, 2003. The terms of the CBA provide that grievances that are not resolved in preliminary step meetings will be submitted to arbitration. The termination grievance was not resolved by meeting, and was submitted to arbitration on January 20, 2004. Taylor refused to attend, however. On February 2, 2004, while the arbitration was pending, Taylor (through counsel) submitted a paper to Local 639 withdrawing her termination grievance. That brought the arbitration to an end.

Less than a month later, on February 27, 2004, in the Circuit Court for Prince George's County, Taylor filed a complaint and demand for jury trial in this action. Giant removed the case to the federal district court in Maryland. It

argued that Taylor's state claims, which by then were set forth in an amended complaint, and included not only the discrimination and retaliation claims but also claims against Giant for misrepresentation and deceit, were preempted by section 301 of the LMRA. Taylor filed a motion to remand the case to state court.

On September 13, 2004, the federal district court issued an opinion ruling that Taylor's claims of discrimination and retaliatory discharge, as set forth in her amended complaint, were not preempted by section 301. On November 8, 2004, the case was remanded to the Circuit Court for Prince George's County.

For over two years, the case was active with motions and discovery. By the end of 2006, by virtue of a second amended complaint having been filed and certain motions having been granted, the case was honed down to a claim for discrimination by Giant before February 3, 2003, based on race and gender, under Md.Code (1957, 2003 Repl.Vol.) section 49B, and Prince George's County Code section 2–222, and a claim for retaliation, on February 28, 2003, also based on race and gender, under the same laws. The discrimination claim had three separate predicates:

1) Disciplinary actions taken by Giant against Taylor for absences and/or tardiness on February 1, and 27, March 4, and May 8, 2002;

2) Giant's placement of Taylor in its "Doctor's Certificate Program"; and

3) Giant's requirement that Taylor undergo an IME.

The predicate for the retaliation claim remained that Giant had fired Taylor on February 28, 2003, for filing her February 3, 2003 discrimination charge.

Giant filed a motion for summary judgment, which Taylor opposed. On December 13, 2006, the court, having heard argument of counsel, issued a written opinion and order granting summary judgment in favor of Giant in part and denying it in part. The court ruled that Taylor's allegations of discrimination based on Giant's disciplinary actions and her

placement in the Doctor's Certificate Program were not "actionable adverse employment action[s]," and therefore could not serve as factual predicates for the discrimination claim. With respect to the allegation that Giant discriminated against Taylor before February 3, 2003, by requiring her to undergo an IME, the court denied summary judgment, stating:

> Plaintiff's failure to undergo an [IME] resulted in her dismissal, an actionable adverse employment action. Plaintiff argued that unlike employees outside of the protected class [African–American females] who were purportedly permitted to submit medical documentation from their personal physicians, she was required to undergo an IME as a condition of employment. Plaintiff raised sufficient facts regarding disparate treatment to establish a prima facie case of discrimination and sufficiently rebutted Giant's proffered nondiscriminatory explanation to allow the question of discrimination relative to the IME to proceed to trial.

The court also denied summary judgment on the retaliation claim.

The case was tried to a jury for seven days, from January 8, 2007, to January 18, 2007. The IME discrimination claim and the retaliation claim were submitted to the jury for decision by a special verdict. The jurors answered the three special verdict liability questions as follows:

1. Do you find by a preponderance of evidence that [Giant] discriminated against [Taylor] on the basis of race prior to filing her February 3, 2003 charge of discrimination against [Giant] by requiring [her] to submit to an independent medical exam (IME)?

 YES _____ NO _√__

2. Do you find by a preponderance of evidence that [Giant] discriminated against [Taylor] on the basis of gender prior to filing her February 3, 2003 charge of discrimination against [Giant] by requiring [her] to submit to an independent medical exam (IME)?

 YES _√__ NO _____

3. Do you find by a preponderance of evidence that [Giant] retaliated against [Taylor] for filing a charge of discrimination on February 3, 2003, against [Giant] by the actions taken by [Giant] on February 28, 2003?

YES √ NO ____

The jurors then awarded Taylor $644,750 in compensatory damages, $1.00 in nominal damages, and zero punitive damages.

Giant filed a post trial motion for judgment notwithstanding the verdict ("JNOV") and/or for remittitur, which Taylor opposed. After holding a hearing, the court entered its order denying those motions on April 6, 2007. Giant noted a timely appeal.[11]

We shall include additional facts as pertinent to our discussion.

## DISCUSSION

## I.

### *Preemption*

■ Giant contends the trial court should have granted its motions for summary judgment, judgment, and JNOV, on both the discrimination and retaliation claims, because they were preempted by federal law. Taylor counters that there was no section 301 preemption of her claims and, in any event, the ruling of the federal district court on preemption established the law in her case on that issue and could not be contradicted by the circuit court on remand.

■ We are dealing with express statutory preemption here. Section 301 of the LMRA establishes federal question subject matter jurisdiction over employment disputes that are covered by collective bargaining agreements. *Foy v. Giant Food, Inc.,* 298 F.3d 284, 287 (4th Cir.2002). It provides, in

---

**11.** Taylor has not filed a cross-appeal challenging any of the rulings by the trial court.

pertinent part, that [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act ... may be brought in any district court of the United States having jurisdiction of the parties. ... [12] LMRA § 301. Whether a state law claim is preempted by section 301 of the LMRA is a question of law, which we review *de novo*. *Foy, supra,* 298 F.3d at 287; *Harris v. Alumax Mill Prods., Inc.,* 897 F.2d 400, 402 (9th Cir.1990); *see also Cramer v. Consol. Freightways, Inc.,* 255 F.3d 683, 689–92 (9th Cir.2001) *(en banc); cf. Garley v. Sandia Corp.,* 236 F.3d 1200, 1206 (10th Cir.2001).

In *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 102–04, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), the Supreme Court held that, under section 301, a claim presenting a straightforward question of interpretation of a collective bargaining agreement must be decided by federal laws and rules. Thus, such a claim brought under state law is preempted by section 301.[13] The Court reasoned that "the subject matter of § 301(a) 'is peculiarly one that calls for uniform law.'" *Id.* at 103, 82 S.Ct. 571 (quoting *Pa. R.R. Co. v. Pub. Serv. Comm'n of Pa.,* 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142 (1919)). It explained:

---

**12.** The full text of section 301(a) states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**13.** Subsequently, the Court held that an action under section 301, *i.e.,* disputing the interpretation of a provision of a collective bargaining agreement, could be litigated in state court, with federal law applying. *Smith v. Evening News Ass'n,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962) (concurrent federal and state jurisdiction over section 301 suits and not consistent with Congressional intent that section 301 be governed by uniform body of federal substantive law); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962) (holding that federal jurisdiction over section 301 suit was not exclusive).

The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. . . .

\* \* \* \* \* \*

The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy.

*Id.* at 103–04, 82 S.Ct. 571. *See also Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 23, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (observing that the "preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization.") (internal quotation marks omitted).

Years later, in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Court reaffirmed what had become known as the *"Lucas Flour"* test of section 301 preemption, stating that preemption occurs "when resolution of a state-law claim is substantially dependent upon analysis of the terms of a [collective bargaining] agreement[.]" *Id.* at 220, 105 S.Ct. 1904. The *Lucas Flour* test was further clarified by the Supreme Court in *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), in which it said:

[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—

necessarily uniform throughout the Nation—must be employed to resolve the dispute.

*Id.* at 405–06, 108 S.Ct. 1877 (footnote omitted).

*Lingle*, in which the Supreme Court held that a plaintiff's state law wrongful discharge claim was *not* preempted under section 301, contains the Court's most recent in-depth analysis of section 301 preemption. Its reasoning is helpful for analysis of the preemption question in the case at bar. The plaintiff in *Lingle* was employed in Illinois, and was subject to the terms of a collective bargaining agreement. That agreement provided that an employee only could be discharged for "just cause." The plaintiff suffered an injury on the job and filed a worker's compensation claim. Thereafter, she was terminated from employment. She brought suit against her employer, in state court, for wrongful discharge, alleging that the employer had fired her in retaliation for her filing a worker's compensation claim, in violation of Illinois state statutory law. The employer removed the case to federal court, on the basis of diversity of citizenship, and then moved for dismissal, arguing that the wrongful discharge claim was preempted under section 301 by the "just cause" provision of the collective bargaining agreement. The district court granted the motion to dismiss, and the Seventh Circuit affirmed.

The Supreme Court reversed. It reasoned that the plaintiff's state law claim was not preempted by section 301 because it would not require the Illinois decision-maker to interpret the "just cause" provision of the collective bargaining agreement. The Court acknowledged that an element of the state law claim was whether the employer's motive in discharging the plaintiff was to interfere with her exercise of her state law worker's compensation rights; and whether the plaintiff was discharged with (or without) "just cause" was an issue that would need to be decided in order to answer that question. It explained, however, that deciding the basic facts of what occurred in the case and then deciding the inferential fact whether the employer's motive to terminate was based on a "just cause" was not a process of interpreting the collective bargaining agreement. The Court stated:

Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement. To defend against a retaliatory discharge claim [under Illinois law], an employer must show that it had a nonretaliatory reason for the discharge; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is "independent" of the collective bargaining agreement in the sense of "independent" that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.

486 U.S. at 407, 108 S.Ct. 1877 (citations omitted). In other words, a question about the *application* of a term of a collective bargaining agreement, such as whether the employee in *Lingle* was fired for "just cause," is not a question of *interpretation* of the same term of the collective bargaining agreement. Whether an employer has "just cause" to terminate an employee is a factual decision, not a legal decision as to the meaning of a term of the collective bargaining agreement. *See, e.g., Brown v. Ford, Bacon & Davis, Utah, Inc.,* 850 F.2d 631, 633 (10th Cir.1988) (reviewing trial court's ruling as to termination for cause under clearly erroneous standard).

The elements of a *prima facie* case of employment discrimination in Maryland, as made actionable by Prince George's County Code section 2–222, are 1) the employee was qualified and in a class protected by the ordinance; 2) the employer took an adverse employment action against the employee; and 3) there was a "but for" causal connection between the employee's protected class status and the employer's decision to take the adverse employment action.[14] *See*

---

**14.** In *Levitz Furniture Corp. v. Prince George's County,* 72 Md.App. 103, 527 A.2d 813 (1987), we explained that courts have explicated various similar, but distinct, statements of what constitutes a *prima facie* case of employment discrimination. *Id.* at 112, 527 A.2d 813. Our formula-

*Cook v. CSX Transp. Co.,* 988 F.2d 507, 511 (4th Cir.1993) (respecting employee disciplinary measures under Title VII); *State Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 696, 818 A.2d 259 (2003). Threatening an employee with an adverse employment action can itself be an adverse employment action. *Cf. EEOC v. Townley Eng'g & Mfg. Co.,* 859 F.2d 610, 614 n. 5 (9th Cir.1988).

■■■ Unless there is direct evidence of the employer's thought process in taking the adverse employment action, the employer's motive for the action must be proven by application of a burden shifting procedure, under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[15] The plaintiff employee bears the initial burden of making out a *prima facie* case of discrimination. The burden then shifts to the defendant employer to show a legitimate non-discriminatory reason for the employment action. Finally, the plaintiff must prove that the reason given by the defendant for the action was/is a pretext, so the real reason the adverse employment action was taken was to discriminate based on protected status. *Id.* at 802–03, 93 S.Ct. 1817. Pretext may be shown by proof that the employer treated other similarly situated employees who were not members of the protected class more favorably than the employer treated the plaintiff. *See id.* at 804, 93 S.Ct. 1817.

---

tion attempts to synthesize those standards. As the *Levitz* Court explained,

> the various formulations of the *prima facie* case ... share a common nucleus of thought: a *prima facie* case is established when a member of a protected group is discharged under circumstances which, if unexplained, would support an inference that the decision to discharge was "based upon a consideration of impermissible factors."

*Id.* (quoting *Furnco Constr. Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)).

**15.** At trial, Taylor pursued her discrimination claim as one in which her evidence of Giant's "thought process" was indirect. For the first time on appeal, she argues that she presented direct evidence on this issue. Having not raised this argument below, and given that the trial court never addressed it (because none of the parties were advocating it), the issue is not properly before this Court for review. Md. Rule 8–131(a).

In the case at bar, therefore, to prevail on her gender discrimination claim, Taylor needed to prove: 1) that she is female (as gender is a protected class under the ordinance); 2) that, before February 3, 2003, Giant required her to take an IME, which constituted an adverse employment action; and 3) there was a "but for" causal connection between Taylor's gender and Giant's conduct in requiring her to undergo an IME. *See Cook, supra,* 988 F.2d at 511; *Kaydon, supra,* 149 Md.App. at 696, 818 A.2d 259.[16] Taylor had the burden of making out a *prima facie* case eliciting evidence of those elements. If she did so, the burden shifted to Giant to show a legitimate non-discriminatory reason for requiring Taylor to undergo an IME; and Taylor then had to prove that Giant treated similarly situated male employees differently by not subjecting them to the same requirement. *McDonnell, supra,* 411 U.S. at 802–03, 93 S.Ct. 1817.

As noted, the CBA governed the employment relationship of the parties to this case. Article 22.7 contains the parties' agreement respecting medical examinations of employees. It states:

> **Physical, mental or other examinations required by a government body or the Company shall be promptly complied with by all employees, provided, however, the Company shall pay for all such examinations except in the cases of disability such as sickness or industrial disability.**
>
> In the event any employee is unable to perform his usual duties due to inability to pass DOT physical examinations, he shall have the opportunity to perform duties in some other classification for which he is capable and physically able to perform with the Company, provided there is a job available. If no job is available within the bargaining unit, the Company will make every effort to place such employee in another position within the Company.

---

16. We do not refer to the discrimination claim based on race because the jury rejected it.

> **The company shall not prohibit an employee with a current valid DOT card from working unless the Company has reasonable cause to believe the employee has a physical or mental condition which necessitates that he be reexamined.**

(Emphasis added.)

Although it is a close question, we conclude that, unlike the state law claim in *Lingle,* Taylor's state law discrimination claim against Giant did in fact call for an interpretation of the critical language of the CBA. Taylor's theory of prosecution was fluid and often elusive. At times, she seemed to be asserting that Giant did not have reasonable cause to require her to undergo an IME (of the type Giant was requiring). If that were the only issue respecting the CBA, that would be a matter of application of Article 22.7 of the contract and not of interpretation of the language of that section. Under *Lingle,* that issue would be a factual question of contract application that is not preempted under section 301.

For the most part, however, Taylor was asserting in the presentation of her case that the language of Article 22.7 did not give Giant any right whatever to require an employee to undergo an IME 1) by a doctor other than a DOT doctor or the employee's private doctor; or 2) when the employee's DOT card was in effect and the IME would not constitute a "reexamination," *i.e.,* a redo of the DOT physical. Thus, Taylor was advocating the position before the jury that Giant could not, under any circumstance, require her to undergo an examination by a doctor it selected, as opposed to a DOT doctor or Dr. Ladd; and that, because she had just had her DOT physical and her DOT card was valid, she could not be kept from working unless there was a reason to redo the DOT physical, which would not and could not involve a gynecological examination. In other words, the language of Article 22.7 actually restricted Giant as to whom it could direct her to be examined by (only a DOT doctor or Dr. Ladd) and the type of examination she could be directed to undergo (only an examination that is part of the DOT physical). As Taylor herself testified, she understood "that [Giant] did not have a right to

tell [her she] had to take an IME by their GYN specialist." She further testified that Local 639 was taking the position that the IME as demanded by Giant was "not a valid request" under the CBA.

Whether the words "independent medical examination" in the first clause of Article 22.7 include examinations by doctors other than DOT doctors or an employee's private doctor, and include examinations outside of what a DOT physical entails, is not a matter of application of the words of that section of the CBA; it is a matter of interpretation of the meaning of those words.

In her case, Taylor called as witnesses several current or former Giant employees to show that they were similarly situated to her but she was treated less favorably than they were. The testimony Taylor elicited from these "comparable" employees makes plain that Taylor's primary theory of discrimination against Giant was that it had no right, under the CBA, to have her undergo an examination by someone other than a DOT doctor or Dr. Ladd, or to require her to undergo an examination not included in the DOT physical (which, as noted above, a gynecological examination is not). Those employees were questioned about whether Giant ever had required them to undergo an IME by someone other than a DOT doctor or their own private doctor, and testified it had not. Some of them also testified that Giant never required them to submit to an examination by a specialist chosen by Giant for an examination beyond the scope of the DOT physical.

There was no focus in the testimony of those employee witnesses on whether there had been a reasonable need to require them to undergo IMEs, and if, or how, that reasonable need compared to the need for Taylor to be examined. Jurors listening to Taylor's testimony and the testimony of the "comparable" employees reasonably would think that Taylor's discrimination argument was, in essence, that Giant did what it *was authorized* to do under the terms of Article 22.7 of the CBA in requiring IMEs for those employees, but treated her

less favorably by doing what it *was not authorized* to do under those terms in requiring her to undergo a gynecological examination by a doctor of Giant's choosing. The actual meaning of the words in Article 22.7, not their application, necessarily was central to the jurors' decision-making in this case.

Taylor moved the CBA into evidence and elicited testimony from Phillip Feaster, the former president of Local 639, about its meaning. She effectively argued that the CBA did not allow Giant to require her to undergo an IME by someone other than Dr. Ladd or a DOT doctor, or of a type not covered by the DOT physical; and that Giant's motive, in so requiring, was to discriminate against her based on her gender. The evidence Taylor adduced to show that Giant treated her unfavorably compared to similarly situated male employees focused on whether Giant ever required them to undergo IMEs not allowed by the CBA, not whether Giant had had reasonable cause to require them to submit to IMEs but required her to undergo an IME without reasonable cause.

In some of the cases concerning section 301 preemption, the courts have made plain that just because there is a tangential issue of interpretation of a collective bargaining agreement, when the primary issue is one of application, not interpretation, there is no preemption. *Martin Marietta Corp. v. Md. Comm'n on Human Relations*, 38 F.3d 1392, 1401 (4th Cir. 1994). In the case at bar, interpretation of the CBA terms was not tangential; it was central to Taylor's case. For this reason, as a matter of law, Taylor's state law discrimination and retaliation claims were preempted under section 301 of the LMRA.

As noted above, Taylor maintains that, because the federal district court ruled, in deciding the propriety of removal to federal court, that her claims were not preempted by section 301, the circuit court was bound by that decision. The law does not support her in this assertion. When the question of section 301 preemption arises in the removal context, as it did here in federal court, the court decides the issue based

upon the allegations within the four corners of the complaint. *Cf. Pauley v. Ford Elecs. & Refrigeration Corp.*, 941 F.Supp. 794, 796 (S.D.Ind.1996) (stating that "[t]he critical facts for deciding that jurisdictional question are the contents of the allegations in the plaintiff's complaint filed in state court"). As Giant points out, section 301 preemption also is a defense to a state law claim requiring interpretation of a collective bargaining agreement. That defense rests upon the evidence adduced in the state court and not upon the mere allegations of the complaint. *Cf. Caterpillar, Inc. v. Williams*, 482 U.S. 386, 398, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) ("The fact that a defendant *might ultimately prove* that a plaintiff's claims are pre-empted under the NLRA does not establish that they are removable to federal court.") (emphasis added). For that reason, a defendant may pursue a section 301 preemption defense in state court even if a federal court has rejected removal based upon section 301 preemption; the federal court's preemption decision in the removal context has no preclusive effect upon the defendant's substantive preemption defense. *Nutter v. Monongahela Power Co.*, 4 F.3d 319, 321 (4th Cir.1993); *Survival Sys. v. U.S. District Court*, 825 F.2d 1416, 1418 (9th Cir.1987), *overruled on other grounds, Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir.2008).

The federal court's preemption decision in this case necessarily hinged upon the allegations in Taylor's amended complaint. As that court observed, the question of section 301 preemption before it was "muddied by the imprecision of [Taylor's] amended complaint. [She] asserts claims of employment discrimination based on race and sex, retaliatory discharge, and misrepresentation and deceit, but it is not always clear which of [Giant's] acts she intends to offer in support of each of these claims." Memorandum Opinion in *Taylor v. Giant Food, Inc.*, Civ. Action No. DKC 2004–0710, at 11. To the best the court could ascertain Taylor's allegations as set forth in the amended complaint, they appeared to involve application, not interpretation, of the CBA.

As we have explained, by the time of trial, based on the evidence Taylor adduced, she was not merely alleging that Article 22.7 was not being applied equally to her based on gender. She was asserting, and putting on evidence to show, that the language of Article 22.7 did not allow Giant to require her to undergo the IME it was directing her to undergo. On that evidence, the discrimination issue was one of interpretation, not application, of the CBA, and therefore Giant should have prevailed on its preemption defense.

## II.

### *Legal Sufficiency of the Evidence*

Even if we were to resolve the preemption issue differently, we nevertheless would reverse the judgment because Taylor did not adduce evidence legally sufficient to make out a claim of discrimination or retaliation. The trial court should have granted Giant's motion for judgment at the close of all the evidence, for lack of evidence of a *prima facie* case of either claim.[17]

### (a)

### *The Discrimination Claim*

As we have discussed already, Taylor's discrimination claim, as charged on February 3, 2003, was that Giant discriminated against her on the basis of her gender by requiring her to undergo an IME by a gynecologist selected by Giant. Giant

---

**17.** Taylor argues in this Court that Giant did not preserve for review the issue of legal sufficiency of the evidence. The record discloses otherwise. After the close of all the evidence, Giant moved for judgment. At that point, the trial court interjected that it first wished to address the parties' suggested jury instructions. After an extensive bench conference, Giant renewed its motion, specifically contending, *inter alia*, that Taylor had failed to establish a *prima facie* case of discrimination or retaliation. Thus, Giant preserved this issue for review, and permissibly moved for JNOV. Md. Rule 2–532(a). *See also Nelson v. Carroll*, 350 Md. 247, 253–55, 711 A.2d 228 (1998) (holding that motion for judgment at close of all the evidence may incorporate by reference the arguments made in previous motion after close of plaintiff's case, and still satisfy particularity requirement of Rule 2–519(a)).

advances three reasons to support its argument that the evidence adduced on the discrimination claim was legally insufficient to create a jury issue, that is, that the evidence viewed in a light most favorable to Taylor would not permit a reasonable finding in her favor on the elements of her claim by a preponderance of the evidence standard. *See Tate v. Bd. of Educ. of Prince George's County*, 155 Md.App. 536, 545, 843 A.2d 890 (2004) ("[I]f there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration."). These arguments are: 1) the conduct by Giant in directing Taylor to undergo an IME was not an adverse employment action, as a matter of law; 2) Taylor failed to adduce evidence that Giant was treating differently, and more favorably, her male co-workers by not requiring them to undergo an IME by a Giant-selected doctor outside the scope of the DOT physicals; and 3) Taylor's evidence could not reasonably establish that Giant's decision to require an IME was pretextual. We shall only address the first two arguments, as they clearly are meritorious.

1. *Adverse employment action.*

As the trial court's pretrial rulings and the special verdict made clear, Taylor's discrimination claim was limited in time to conduct by Giant before February 3, 2003, when she filed her discrimination charge, and was limited in conduct to Giant's having required her to undergo an IME by a doctor of Giant's choice, for a condition the DOT physical does not cover. In order to prove her discrimination claim, Taylor had to adduce evidence that she belonged to a protected class, suffered an adverse employment action, and that her membership in the protected class was causally related to the adverse employment action.

The evidence presented in the case at bar, credited exclusively to Taylor, does not constitute proof of an adverse employment action against her before February 3, 2003, based on any of the conduct alleged for a relevant period of time before that. The first mention of an IME was made by Weiss

in his December 24, 2002 letter, in which he spoke of obtaining a second opinion (in addition to the one expressed by Dr. Ladd) about Taylor's gynecological condition. From then through February 2, 2003, there were two IME appointments scheduled for Taylor, but broken; after the first appointment (January 7) was not kept, Smith arranged for the second appointment (January 23) and on January 14, Kingstree informed Taylor of that in writing. As Taylor testified, there was nothing said during that period of time to suggest that the consequence of failing to appear for the scheduled IME would be termination. On the contrary, all Taylor was told was that failure to appear would result in Giant's deciding her grievances based on the call-in rule against her, and could pose a problem for her taking FMLA leave as, in the opinion of the relevant people at Giant, the call-in rule still applied when she was taking FMLA leave.

■■■ With respect to a substantive discrimination claim, an adverse employment action is one that affects the " 'terms, conditions or benefits of employment.' " *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 60, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Von Gunten v. Maryland,* 243 F.3d 858, 866 (4th Cir.2001)). There was no evidence at trial of anything to that effect. Indeed, the only evidence that Giant's requirement that Taylor undergo the requested IME caused anything, prior to February 3, 2003, is that it "devastated" her because she feared that if she did not attend, she would continue to violate the call-in rule and to be disciplined for that violation and would continue to bring grievances that would be denied; and, as the number of offenses mounted, the form of discipline imposed would become more severe, and eventually would result in her losing her job.

■■■ The case law is clear that imposition of discipline that does not materially affect the terms, conditions, or benefits of employment is not an adverse employment action for purposes of a discrimination claim. *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 651 (4th Cir.2002); *Kersting v. Wal–Mart Stores, Inc.,* 250 F.3d 1109, 1115 (7th Cir.2001). Here, there

was no evidence that, before February 3, 2003, any discipline was imposed upon Taylor as a consequence of Giant's request that she undergo an IME and her failure to do so. Taylor's *fear* that she eventually would be disciplined severely, so as to affect the terms, conditions, or benefits of her employment, was not itself an adverse employment action. *See Massie v. Ikon Office Solutions, Inc.*, 381 F.Supp.2d 91, 99 (N.D.N.Y. 2005).

Taylor argues that, to prove an adverse employment action, she only needed to show a threat of an adverse employment action during that period of time. Even if that were the case, there was no evidence of any threat of an adverse employment action being made to her during that time period. All Taylor was told about the consequence of not submitting to the requested IME was that she would not prevail in her grievances and she might have problems using her FMLA leave because, in Giant's view, she still was required to adhere to the call-in rule when taking such leave, and she had in the past not done so. Neither of those predictions of consequences was a threat to take any action against Taylor that would adversely affect the terms, conditions, or benefits of her employment.

## 2. *Disparate Treatment*

Taylor called as "comparator" witnesses four men and one woman. They testified as follows:

- *Richard Dale Graham:* A Giant truck driver for 25 years, he started to experience dizziness and memory loss around 2003. He was taken off work automatically due to the dizziness, and was out for six months. He underwent a procedure in which fluid was drained from his body, which corrected the dizziness problem, and he took Aricept for the memory issue. When he returned to work, Nick Galyean had him undergo a DOT re-examination. He was not asked or required to undergo an IME by a Giant-specified doctor.

- *Kevin Dorsey:* He also was a Giant truck driver, until late 2006. While he worked for Giant, he was diagnosed with diabetes. Giant did not ask or require him to undergo an IME by a Giant-specified doctor.

- *Millard Humphries, III:* In late 2003, during his employment by Giant as a truck driver, he was diagnosed with Parkinson's Disease. When he informed Nick Galyean of that, he was told just to keep an eye on it. In his next DOT physical, in July 2005, he was disqualified from driving. He appealed that decision by being evaluated by his private doctor, who opined that he was fit to drive. He took and passed a road test and then was issued a DOT card good for one year. He undergoes a DOT physical every year. Giant never asked or required him to undergo an IME by a Giant-specified doctor.

- *Alton Lucas:* He has worked as truck driver for Giant since 1994. During a DOT physical, he was diagnosed with diabetes, and therefore did not receive his DOT card. He had to go to his primary care doctor to verify that he had diabetes and determine his fitness for work. His doctor found him fit for work, and he was issued a one-year DOT card. No one with Giant told him to have an IME by any particular doctor or asked to see his medical records.

- *Beth Bandy:* She worked as a truck driver for Giant from 1985 to 2005. Sometime during her employment she broke her arm. When her private doctor released her to full duty, still with a cast on her arm, her supervisor approved her working "on the street," *i.e.*, on a regular trucking route. Sometime in the late 1990's, an extra heart beat was detected during her DOT physical. Giant identified a cardiac specialist for Bandy to go to to read her EKG before she could have her DOT card renewed. That doctor had her wear a Holter monitor for five days, during which time she was taken "off the street" and assigned to work as a yard jockey. After that test, she was given her DOT card. During the 20 years Bandy worked for Giant, she experienced heavy menstrual bleed-

ing. She did not inform anyone with Giant about that. She had no difficulty driving with that condition. In 2006, after she had left employment with Giant, she was diagnosed with fibroid tumors.

To prove gender discrimination, Taylor was required to put on evidence that she was treated differently than similarly situated male employees. To be similarly situated to Taylor, her comparator employees had to have dealt with the same supervisor, been subject to the same standards, and engaged in conduct that would not distinguish Giant's treatment of them from Giant's treatment of her. *Strickland v. United Parcel Serv., Inc.,* 555 F.3d 1224, 1233 (10th Cir.2009); *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir.2000); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998).

The male comparator witnesses called by Taylor were not similarly situated to her, as a matter of law. As noted above, two suffered from diabetes, one suffered from Parkinson's Disease, and one experienced dizziness and some memory loss. In all of those cases, the medical condition could be followed and monitored through the DOT physicals the employees all were required to undergo. In none of the cases were the employees seeking to be excused from the "call-in" requirement, or any other requirement, due to their condition, nor were they asking to take FMLA leave because of their condition. In all four cases, the employees' regular private doctors followed up with them and reported that they were fit for work. For that reason, in all four cases there never was a reason to request an IME for a second opinion.

In Taylor's case, by contrast, her condition was not susceptible of monitoring through the DOT physicals. She, unlike the others, was asking to be excused from the "call-in" requirement on the basis of her condition, and to take FMLA leave for it. The private doctors for the other employees all had given a "thumbs up" to the employees' returning to regular work. By contrast, Dr. Ladd gave an opinion that, far from allaying concerns, raised concerns about Taylor's fitness to drive. In Taylor's case, because of the concerns raised by Dr.

Ladd, there was a reason to seek a second opinion. There also was a reason to do so through an IME, as DOT physicals do not cover gynecological problems.

In addition, Beth Bandy, who was called as a comparator by Taylor to show that as women they were treated differently than men, did not give testimony that could be understood to show that the two were similarly situated. With respect to her broken arm, Bandy's private doctor had opined that she could return to full duty notwithstanding her cast. Under the circumstances, there would be no reason to obtain a second opinion about that through an IME. Bandy's doctor, like the private doctors for the four men, gave reassurance about her fitness to drive and, unlike Dr. Ladd, did not depict a scenario in which it could be dangerous for her to be on the job. Bandy and Taylor were not similarly situated in any way.

To be sure, Bandy was the only other employee of those called by Taylor to have undergone an IME by a Giant-selected doctor. The doctor was a specialist who was asked to run tests to check on a heartbeat problem discovered during the regular DOT physical. There is no indication at all in Bandy's testimony that the heartbeat problem did not have to be followed up or that she herself had a private cardiac specialist who could perform the follow-up test.

Moreover, none of the comparator witnesses dealt with the same management people (Smith and Weiss) who were involved in Giant's requesting Taylor to undergo an IME.

The comparator evidence introduced by Taylor was not such as to allow any reasonable fact-finder to conclude that Taylor was treated differently—that is, required to undergo an IME by a Giant-specified doctor for a condition not covered by a DOT physical—than similarly situated male employees at all, let alone on the basis of gender.

### (b)

### *The Retaliation Claim*

To prevail in a claim for retaliation, the employee must show that she was subjected to retaliatory treatment for

engaging in protected conduct. *See, e.g., Burlington, supra,* 548 U.S. at 59–60, 126 S.Ct. 2405. Filing a charge of discrimination is protected conduct. Md.Code, Art. 49B, section 16(f). Retaliatory treatment is not limited to adverse employment actions; it encompasses any action by the employer that " 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Burlington, supra,* 548 U.S. at 68, 126 S.Ct. 2405 (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir.2006)). It was Taylor's theory of prosecution throughout this case, however, that the retaliation against her took the form of her being effectively discharged from employment on February 28, 2003. Assuming that the jurors credited Taylor's testimony that the meeting on February 28, 2003, was tantamount to her being discharged as of that day, Taylor was required to prove that her termination was caused by her having filed the February 3, 2003 discrimination charge; *i.e.,* that the firing was in retaliation for her having engaged in that protected conduct.[18]

It is well settled that for an employee to prove a causal connection between an adverse employment action and protected conduct, she must show that the relevant actors involved in the adverse employment action had knowledge that

---

**18.** Giant argues that, because the enabling statute, Md.Code, Art. 49B, section 42, provides a private cause of action to "a person who is subjected to an act of discrimination prohibited by the county code," then by implication there is no private cause of action for *retaliation* under section 42 and the Prince George's County Code. *See McCrory Corp. v. Fowler,* 319 Md. 12, 570 A.2d 834 (1990), *superseded by statute,* 1992 Md. Laws, ch. 555. *See also Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 636–38, 881 A.2d 1212 (2005). We note that section 2–186 of the county code does not define "retaliation." However, it defines "discrimination" as follows:

Discrimination shall mean acting, or failing to act, or unduly delaying any action regarding any person because of race, religion, color, sex, national origin, age (except as required by state or federal law), occupation, familial status, marital status, political opinion, personal appearance, sexual orientation, or physical or mental handicap, in such a way that such person is adversely affected in the area[ ] of ... employment[.]

We assume without deciding that section 42, in conjunction with the Prince George's County Code, creates a private cause of action for retaliation.

she had engaged in the protected conduct. *Gorum v. Sessoms*, 561 F.3d 179, 188 (3rd Cir.2009); *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir.2003).[19] Here, then, the burden was on Taylor to show that the decision-makers in her termination on February 28, 2003, knew before the termination that she had filed the February 3, 2003 discrimination charge. Clearly, one person cannot retaliate against another for certain conduct of the other if the person does not know about the other's conduct.

Based upon Taylor's own testimony, the decision-makers in her termination on February 28, 2003 (again, assuming that her testimony was credited) were Smith, and possibly the two other people present at that meeting (David and Galyean). Taylor adduced no evidence that any of those people knew, when the meeting took place on February 28, that she had filed her February 3, 2003 discrimination charge against Giant. She did not adduce any first level facts to show, or even any facts from which an inference of knowledge could be drawn to show, that Smith or the two men knew about the discrimination charge. Even if Weiss is included as a decision-maker, in that he consulted with Smith about the issue of having Taylor undergo an IME consisting of a gynecological examination, there was no evidence adduced that Weiss had any knowledge that the discrimination charge had been filed. To the contrary, Smith and Weiss both testified, without contradiction, that they did not know about the February 3, 2003 charge until March or after. Specifically, Weiss learned

---

**19.** In *Burlington, supra*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345, the Supreme Court relaxed the plaintiff's burden in a retaliation claim as to the adverse employment action element. The Court held that an employee alleging retaliation must show only "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 68, 126 S.Ct. 2405 (quoting *Rochon, supra*, 438 F.3d at 1219). Here, we have accepted for purposes of appeal that the retaliatory action was termination; our concern lies with the causality element of the retaliation claim.

of the charge on March 15, 2003, and Smith learned of it in "late May or April."

The sole evidence presented in the entire case that anyone at Giant knew about the February 3, 2003 discrimination charge was Garrett's testimony that on February 7, 2003, he received in the mail the standard notice of the filing of a discrimination charge, from the Prince George's County Human Relations Commission. There was no evidence, either through Garrett or any other witness, that he told any of the people involved in Taylor's termination decision about the charge. Nor was there any evidence that Garrett had any involvement in the IME requirement or any events concerning Taylor that transpired in January or February 2003. His last involvement in her grievances was to attend the November 8, 2002 meeting.

On the evidence adduced at trial, no reasonable juror could have found, by a preponderance of the evidence, that any of the relevant people or decision-makers involved in her termination on February 28, 2003, or indeed in anything that happened to her before she filed her retaliation charge on March 6, 2003, knew that she had filed the February 3, 2003 discrimination charge. There simply was a failure of evidence on this element of Taylor's retaliation claim. Accordingly, for that reason, the trial court should have granted Giant's motion for judgment at the close of the case.

**JUDGMENT REVERSED. COSTS TO BE PAID BY THE APPELLEE.**