33 A.3d 445

Julia M. TAYLOR

v.

GIANT OF MARYLAND, LLC.

Nos. 9, 10, Sept. Term, 2010.

Court of Appeals of Maryland.

Dec. 6, 2011.

Reconsideration Denied Jan. 19, 2012.

Cynthia E. Young, Annapolis, MD, for Petitioner.

Jo Ann Myles, Largo, MD, for Petitioner.

Connie N. Bertram (Cooley LLP, Washington, DC), on brief, for Respondent.

Deborah Thompson Eisenberg, Baltimore, MD, Julie Glass Martin–Korb, Rockville, MD, Alan R. Kabat, Bernabei & Wachtel, PLLC, Washington, DC, for Amici Curiae brief of Maryland Employment Lawyers Association and Metropolitan Washington Employment Lawyers Association in Support of Petitioner.

Argued before BELL, C.J., BATTAGLIA, GREENE, *MURPHY, BARBERA, JOHN C. ELDRIDGE (Retired, Specially Assigned), LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

We are asked to review a jury verdict in favor of the Petitioner, Julia M. Taylor, an African American female, in a suit in which she alleged both sexual discrimination and retaliatory termination against Giant of Maryland LLC, Respondent.[1] The focal point of our review of the discrimination

---

* Murphy, J., participated in the hearing of this case as an active member of this Court, but did not take part in the conference and adoption of the opinion.

1. Ms. Taylor initially not only sued Giant, but also Local No. 639 of the Drivers, Chauffeurs and Helpers Local Union and Michael David, a

verdict is the application of "comparator evidence"[2] in the context of Ms. Taylor's claim of disparate treatment related to Giant's requirement that she undergo an independent medical examination because of a gynecological condition. We also must determine whether Ms. Taylor adduced legally sufficient evidence to support the jury's retaliatory discharge verdict, which was premised upon Ms. Taylor's termination some twenty-five days after having filed a discrimination claim with the Prince George's County Human Relations Commission. We seminally must also address whether it was appropriate for Ms. Taylor's suit to proceed in state court or whether her claims had to be federally litigated.

Ms. Taylor, a former tractor-trailer driver for Giant of Maryland, LLC, Respondent, filed a complaint in the Circuit Court for Prince George's County alleging not only breach of contract, but that Giant discriminated against her based on her race and gender under Section 42 of Article 49B, Maryland Code (1957, 2003 Repl. Vol.),[3] and Section 2–222 of the Prince George's County Code,[4] as a result of having required

---

shop steward, and included a number of other legal theories in her initial and Second Amended Complaint. Giant, however, now is the sole party before us.

**2.** Comparator evidence refers to evidence that a "similarly situated" individual with "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Eaton v. Ind. Dep't of Corrections*, 657 F.3d 551, 556 (7th Cir.2011), quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.2007).

**3.** Section 42 of Article 49B provided, in pertinent part:
(a) *Authorized.*—In Montgomery County, Prince George's County, and Howard County, in accordance with this subtitle, a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.
Maryland Code (1957, 2003 Repl.Vol.), Section 42 of Article 49B.

**4.** Section 2–222 of the Prince George's County Code provided:
No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or

her to undergo an independent medical examination for "menorrhagia," or heavy, prolonged menstrual hemorrhaging,[5] and uterine fibroids, when male truck drivers with health conditions of their own were not required to do so.

Ms. Taylor also alleged that, within three weeks after she had filed her discrimination claim with the Prince George's County Human Relations Office, Giant retaliatorily terminated her employment. She requested an award of $750,000 in compensatory damages and $750,000 in punitive damages as to each count, as well as a declaratory judgment that "the acts and practices" of Giant "violate the policies and laws of Prince George's County and the state of Maryland," to reinstate her employment with Giant with back pay, and to award her reasonable attorneys' fees. After a seven-day jury trial, Ms. Taylor was the victor on the issues of sex discrimination and retaliatory termination, while Giant successfully defended on the issue of racial discrimination, culminating in an award of $644,751.00 in damages to Ms. Taylor.[6] Subsequently, Ms. Taylor was awarded attorneys' fees in the amount $511,255.00 and costs in the amount of $33,670.00.

After Giant took appeals from the verdicts and the award of attorneys' fees, the Court of Special Appeals reversed the judgments of the trial court, *Giant v. Taylor*, 188 Md.App. 1, 981 A.2d 1 (2009), concluding that Ms. Taylor's claims were preempted by Section 301 of the Labor–Management Rela-

---

other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination.
Prince George's County Code (2003), Section 2–222.

**5.** The entry for "menorrhagia" in Stedman's Medical Dictionary references another entry, for "hypermenorrhea." Stedman's Medical Dictionary 1185 (28th ed. 2006). "Hypermenorrhea" is defined as "[e]xcessively prolonged or profuse" hemorrhaging in the "uterine mucous membrane." *Id.* at 923, 1185.

**6.** The jury awarded Ms. Taylor damages as follows:
   **a. Compensatory Damages**   $644,750.00
   **b. Nominal Damages**   $1.00
   **c. Punitive Damages**   %0.00
       **TOTAL**     **$6.44,751.00**

tions Act,[7] and even if they were not, Ms. Taylor failed to adduce legally sufficient evidence of discrimination and retaliatory termination. Moreover, although Ms. Taylor opposed review of her award of attorneys' fees on grounds that Giant failed to note its appeal within the obligatory thirty days, the intermediate appellate court exercised its jurisdiction to review the award and vacated it, because Ms. Taylor was no longer the prevailing party.

We granted certiorari, *Taylor v. Giant*, 412 Md. 495, 988 A.2d 1008 (2010), to consider the following questions, which we have reordered:

I. Does the Court of Special Appeals' opinion announce an application of preemption law which is contrary to existing law?

II. Has the Court of Special Appeals created a new, impossible standard for comparator evidence and "adverse employment action?"

III. Did Taylor present legally sufficient evidence that she was subjected to retaliatory treatment by Giant?

We also granted certiorari to consider a related question, *Taylor v. Giant*, 412 Md. 495, 988 A.2d 1008 (2010), as follows:

Where the Respondent filed a notice of appeal 34 days after entry of a collateral order for attorney's fees following judgment on the merits, did the Court of Special Appeals have jurisdiction to consider the second appeal?

We shall hold that Ms. Taylor's sex discrimination and retaliation claims were not preempted by Section 301 of the Labor–Management Relations Act, 29 U.S.C. § 185(a). We

---

7. Section 301 of the Labor–Management Relations Act provides, in pertinent part:

(a) Venue, amount, and citizenship. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (2006).

shall further hold that the trial court applied the correct standard for comparator evidence as it relates to adverse employment actions. We shall also hold that Ms. Taylor adduced legally sufficient evidence to support the retaliation verdict, because a rational fact finder could have found that the decision-makers at Giant knew of her February 3, 2003 discrimination claim prior to the date of her termination, February 28, 2003. We address Ms. Taylor's fourth question regarding the Court of Special Appeals's jurisdiction to review the award of attorney's fees and determine that the failure of Giant to appeal within 30 days was fatal to its claim about attorney's fees but remand for the intermediate appellate court to consider other issues that were left unaddressed in Giant's initial appeal.

**Background**

Ms. Taylor, an African American female, worked full-time as a tractor-trailer driver for Giant, making local deliveries of merchandise and groceries, from 1988 to 2003; she was a member of the Drivers, Chauffeurs and Helpers Local Union No. 639 Teamster's Union at all times. At some point in 1995, Ms. Taylor was diagnosed with menorrhagia, or heavy, prolonged menstrual bleeding and fibroid tumors, by her gynecologist. Ms. Taylor testified that she told her direct supervisor at the time, Pamela Sanford, of the diagnosis, and Ms. Taylor occasionally requested time off from work to facilitate her treatment. Ms. Taylor testified that, because of her condition, she would "start[ ] experiencing heavy bleeding sometimes prior to going to work, and it would interrupt the flow of preparing to get to work, getting dressed, getting showered," which in turn delayed her arrival at work.

At trial, it was established that Giant required its drivers to call in at least 1.5 hours ahead of a scheduled shift, if they were going to be tardy or absent. If a driver failed to abide by the call-in requirement twice within a one-month period, he/she could be subject to discipline. Ms. Taylor testified that "on some days, if the bleeding was too heavy," she would not have the ability to provide the required 1.5 hours advance

notice of her absence or lateness. Ms. Taylor began requesting Family and Medical Leave Act ("FMLA") leave time in order to compensate for her gynecological-related lateness and absence, which Giant approved.

Because of the call-in policy and Ms. Taylor's inability to call in within the 1.5 hour time frame, however, Giant issued Ms. Taylor various disciplinary notices: A March 5, 2002 notice reflected that Ms. Taylor was late to her scheduled shift "twice within a 30 day period" and that her "[n]ext offense may result in more severe disciplinary action, up to and including [t]ermination"; a March 11, 2002 notice provided that "driver called 41 minutes prior to shift start at 07:15 am" and "[f]ailed to give required 1 1/2 hour notification." A May 11, 2002 notice directed to Ms. Taylor similarly provided that Ms. Taylor "phoned in 1 hr. 2 min. prior to shift start time at 04:30 am" and "[n]ext offense may result in more severe disciplinary action up to and including termination." Yet another notice, dated October 18, 2002, reflected that Ms. Taylor "called off sick" and "failed to provide medical documentation."

In response to the disciplinary notices, Ms. Taylor provided excuse slips penned by Dr. Jill Ladd, explaining that her violations of the call-in rule were due to a "gynecological problem." Ms. Taylor also filed various grievances with Local 639, requesting that she have an opportunity to "present an explanation for [her] actions." At the disciplinary hearing related to the notices, Ms. Taylor explained that she was unable to comply with Giant's call-in rule because of her gynecological condition. At the November meeting, which was attended by several Giant officials, including Theodore Garrett, the Manager of Fair Employment at Giant, Ms. Sanford, Ms. Taylor's supervisor, and Eric Weiss, Vice President of Labor Relations at Giant, Ms. Taylor was asked several questions about the effect her condition would have on her ability to abide by Giant's call-in rule; various of those questions were included in a letter dated November 14, 2002, addressed to her and John Steger, a Local 639 official, as follows:

(1) Was Ms. Taylor physically incapable on March 4, 2002 and May 8, 2002 of providing Giant with 1.5 hours notice of her absences?

(2) If so, why?

(3) Will there be occasions in the future where Ms. Taylor's medical condition renders her physically incapable of providing Giant with 1.5 hours notice of her absence?

(4) If so:

(a) Why?

(b) How frequently will Ms. Taylor be rendered physically incapable of providing the requisite amount of advance notice?

(c) What is the expected duration of Ms. Taylor's physical inability to provide the requisite amount of advance notice?

(d) Given the answer to 4(a), how much advance notice will Ms. Taylor be capable of providing during the period referenced in response to question number 4(c)?

Ms. Taylor's response was generated by Dr. Ladd in a letter dated December 11, 2002:

As previously indicated on her FMLA forms, she has a problem with menorrhagia and uterine fibroids. On occasion she will suddenly start bleeding excessively. This can occur suddenly, with no warning and when she hemorrhages she is required to get off her feet and rest to decrease the bleeding. This has required her to miss work, including 3/4/02 and 5/8/02. Unfortunately, these symptoms can occur quite suddenly, making it impossible for her to predict when she will need to stay home from work, and the sudden onset can prevent her from giving the required 1.5 hrs. notice to her job, as was the case on 3/4/02 and 5/8/02. There may be occasions in the future requiring Ms. Taylor to miss work without knowing 1.5 hrs. beforehand. Some months the bleeding is manageable with routine activities, and some months it is not. She is currently trying different medical options to control this problem and if these fail, she will need to undergo surgery. To undergo major surgery is not a decision to be made lightly and is not unusual for my

patients to try other therapies for 6–12 months before finally scheduling a date.

Mr. Weiss did not review the doctor's response until some time in early January, because of vacation but, in the meantime, had advised Ms. Taylor by letter dated December 24, 2002 that he still had not received the documentation he requested, and thus, "Giant ha[d] no choice but to seek a second medical opinion concerning Ms. Taylor's ability to comply with the 1.5 hour call-in requirement." Mr. Weiss directed Mr. Steger, the Local 639 official, to have Ms. Taylor set up an independent medical examination with the Kingstree Group, the relevant medical examiner, by December 31, 2002. Mr. Weiss also stated that Ms. Taylor was required to take the examination by January 7, 2003, and that if she failed to do so, Giant would have "no choice but to deny her grievances" and perhaps to deny future requests for FMLA leave.

After Mr. Weiss finally had an opportunity to review Dr. Ladd's letter in January of 2003, however, he asked Josie Smith, Giant's Human Resources Manager for Distribution, to explore whether Ms. Taylor's gynecological condition presented a safety issue. Ms. Taylor did not attend the scheduled January 7, 2003 independent medical examination; another examination at the Kingstree Group was scheduled for January 23, 2003, but Ms. Taylor did not appear for that examination and requested to have the examination rescheduled for April 7, 2003.

Ms. Taylor filed a discrimination claim on February 3, 2003 with the Prince George's County Human Relations Commission, which provided, in pertinent part:

> On November 8, 2002, Management decided that the medical documentation used to initially approve my FMLA was now not adequate. I was forced to provide additional medical documentation and they are now saying I have to undergo further testing with their doctors. Other employees (Male, White) are not similarly treated.

The Prince George's County Human Relations Commission mailed a notice of Ms. Taylor's discrimination claim to Mr.

Garrett, the Manager of Fair Employment at Giant, with whom Ms. Taylor had met before, who testified that he received the claim on February 7, 2003.

Ms. Taylor continued working for approximately three and a half weeks, until February 28, 2003. That day, after Ms. Taylor's shift, Ms. Smith called a meeting, which also was attended by Michael David, a shop steward, and Nick Galyean, the Fleet Safety Director at Giant. Ms. Taylor testified that she was told that the topic of the meeting was her safety and her "ability to drive the tractor-trailer" because of her gynecological conditions. During that meeting, all male personnel left the room while Ms. Smith and Ms. Taylor spoke alone about Ms. Taylor's ailments. At trial, the parties' versions of what was said in this private meeting differ. Ms. Taylor testified that Ms. Smith told her she would have to submit to an independent medical examination and follow any and all recommendations made by Giant's selected specialist, up to and including hysterectomy, which Ms. Smith denied. Further, Ms. Taylor testified that she was told she would be taken off the road and not "rehir[ed]" until she underwent an the independent medical examination and any recommended procedure, which she interpreted to mean she had been fired. Ms. Smith, on the other hand, testified that Ms. Taylor agreed to take the independent medical examination before the meeting adjourned.

No independent medical examination occurred. Rather, shortly after her meeting with Ms. Smith, Ms. Taylor applied for unemployment benefits and began looking for a new job. On March 6, 2003, she filed a claim of retaliation against Giant, in which she alleged she had been terminated as a result of her filing a discrimination claim on February 3, 2003: [8]

I believe that the Respondent has retaliated against me for filing a Title VII based complained by terminating my employment because:

On February 3, 2003, I filed a discrimination complaint. On February 28, 2003, I was terminated from my employment.

---

**8.** The parties attempted, without success, to mediate Ms. Taylor's complaint with the Prince George's County Human Relations Commission.

I was told by the Human Resources Representative that I was terminated until I took a Physical. I explained to the Respondent that I just had a Physical in December 2002 (DOT). The Representative stated that I was a safety risk and that is why I was being taken off the road.

I believe that the Respondent has taken this action to further discriminate against me in retaliation for filing the previous Title VII complaint.

Ms. Taylor also filed a grievance with Local 639 the same day, in which she set forth substantially the same allegations.[9]

After a substantial procedural history and two removals to federal court and remands back to the Circuit Court for Prince George's County, the case proceeded before a jury for seven days on the issues of gender and race discrimination related to the required independent medical examination and the retaliatory discharge. At the close of a seven-day jury trial, both parties made the appropriate motions, which were denied. After deliberating, the jury recorded its verdicts as follows:

1. Do you find by a preponderance of evidence that Giant of Maryland, LLC, discriminated against Plaintiff Julia M. Taylor on the basis of race prior to filing her February 3, 2003 charge of discrimination against Giant of Maryland, LLC, by requiring Plaintiff to submit to an independent medical exam (IME)?

YES _____        NO ___✓___

2. Do you find by a preponderance of evidence that Giant of Maryland, LLC discriminated against Plaintiff Julia M. Taylor on the basis of gender prior to filing her February 3, 2003 charge of discrimination against Giant of Maryland, LLC by requiring Plaintiff to submit to an independent medical exam (IME)?

---

**9.** Arbitration proceedings were initiated regarding Ms. Taylor's union grievances, but were subsequently terminated.

YES ___✓___          NO _____

3. Do you find by a preponderance of evidence that Giant of Maryland, LLC retaliated against Plaintiff Julia M. Taylor for filing a charge of discrimination on February 3, 2003, against Giant of Maryland, LLC by the actions taken by Giant of Maryland, LLC on February 28, 2003?

YES ___✓___          NO _____

Thereafter, Giant filed a Motion for Judgment Notwithstanding the Verdict, or in the Alternative, to Reduce the Award, in which it argued that Ms. Taylor's gender discrimination and retaliation claims were preempted by Section 301 of the Labor–Management Relations Act and that, in the alternative, Ms. Taylor failed to adduce legally sufficient evidence of discrimination and retaliation to support the jury verdict. The trial court denied the motion.

Ms. Taylor filed a post-trial motion requesting attorneys' fees and costs, which Giant opposed. In a memorandum opinion and order, the trial court awarded attorneys' fees in the amount $511,255.00 and costs in the amount of $33,670.00.

The Court of Special Appeals reversed, in a reported opinion,[10] *Giant v. Taylor*, 188 Md.App. 1, 981 A.2d 1 (2009),

---

**10.** While Giant advanced numerous grounds for reversal in its brief before the Court of Special Appeals, the intermediate appellate court addressed only "Question 1" of Giant's brief, which asked:

[w]hether the circuit court erred in denying various motions filed by Giant on the ground that Taylor's claims were preempted by federal law ... [and] whether Giant's motion for judgment should have been granted on the ground that Taylor did not present legally sufficient evidence of a claim for discrimination or a claim for retaliation.

*Giant v. Taylor*, 188 Md.App. 1, 7, 981 A.2d 1, 4 (2009). Footnote one of the opinion stated:

These issues all are raised in Question I of the questions presented in Giant's brief. That question also asked whether the trial court erred in denying Giant's motion for judgment on liability based on the absence in the Prince George's County Code of a cause of action for retaliation. Given our disposition of this appeal, we need not address that issue; nor need we address Questions II, III, and IV.

determining that Section 301 of the Labor–Management Relations Act, 29 U.S.C. § 185(a) preempted Ms. Taylor's discrimination and retaliation claims. Drawing upon the United States Supreme Court's decision in *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), the Court of Special Appeals reasoned that Ms. Taylor's discrimination claim called for an "interpretation of the critical language of" Article 22.7 of her collective bargaining agreement, which permitted Giant to request a re-examination of a D.O.T. approved driver if it had "reasonable cause to believe the employee has a physical or mental condition which necessitates that he be reexamined." *Giant,* 188 Md. App. at 28, 981 A.2d at 16. Regarding Ms. Taylor's sex discrimination claim, the Court of Special Appeals decided that the independent medical examination was not an adverse employment action and that Ms. Taylor's male comparators were "not similarly situated to her, as a matter of law," because they had different supervisors and their health conditions "could be followed and monitored" through the Department of Transportation's mandatory physicals. *Id.* at 37–38,

---

*Giant v. Taylor,* 188 Md.App. 1, 7 n. 1, 981 A.2d 1, 4 n. 1 (2009). Questions II, III, and IV stated:

    II. Did the trial court err by denying Giant's motion for judgment on damages made on the following grounds:

- damages only could be recovered for the time period between Taylor's removal from the work schedule and her termination; and
- lost earnings could not be recovered because Taylor failed to mitigate her damages?

    III. Did the trial court make the following evidentiary errors:

- error in excluding evidence about the basis for Giant's decisions to request that Taylor submit to a fitness-for-duty examination by a specialist and to remove her from the schedule until she complied with that request?
- error in admitting testimony of other drivers
- error in admitting Taylor's "post hoc notes" of a meeting with Giant representatives prepared after Taylor had a motive to fabricate?

    IV. Did the trial court make the following errors in its instructions and in the verdict sheet:

- error in failing to provide the jury with a proper verdict sheet?
- error in refusing to give a jury instruction concerning Taylor's obligation to mitigate damages, and the essential elements of her discrimination and retaliation claims?

*Id.* at 7 n. 1, 981 A.2d at 4 n. 1.

981 A.2d at 22–23. In disposing of the related retaliatory discharge claim, the intermediate appellate court determined that Ms. Taylor failed to show "that the decision-makers in her termination ... knew before the termination that she had filed" a discrimination charge. *Id.* at 39–40, 981 A.2d at 23–24. Finally, in a separate, unreported opinion, the Court of Special Appeals reversed the award of attorneys' fees to Ms. Taylor's counsel, reasoning, in part, that Ms. Taylor was no longer "a prevailing party below," and thus, that she was "not eligible for a statutory award of fees and costs under Article 49B, Section 42(c)."

**Discussion**

■ Initially, we must determine whether Ms. Taylor's discrimination and retaliatory discharge claims must be decided in a federal forum rather than in a state court because of Section 301 of the Labor–Management Relations Act, 29 U.S.C. § 185(a), involving violations of collective bargaining agreements, as Giant asserts. Section 301 provides, in pertinent part:

> (a) Venue, amount, and citizenship. Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (2006). Section 301 of the Labor Management Relations Act, in providing federal courts jurisdiction to consider claims involving collective bargaining agreements, does not obviate state courts' jurisdiction to entertain such cases. *United Steelworkers of America v. Rawson,* 495 U.S. 362, 368, 110 S.Ct. 1904, 1909, 109 L.Ed.2d 362, 372–73 (1990), citing *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

■ Rather, Section 301 does not permit the application of state law in the context of collective bargaining agreements. In effect, state-law causes of actions relating to violations of collective bargaining agreements are "displaced" by federal

law. *United Steelworkers of America,* 495 U.S. at 368, 110 S.Ct. at 1909, 109 L.Ed.2d at 372–73. We observed in *Batson v. Shiflett,* 325 Md. 684, 717–18, 602 A.2d 1191, 1208 (1992), that "[s]uits alleging a breach of a collective bargaining agreement are governed, not by state law, but by a special body of federal common law developed under § 301." We also noted, nevertheless, that a state law claim which could be resolved without interpretation of a collective bargaining agreement could be brought in state court, even if the case required "addressing precisely the same set of facts." *Batson,* 325 Md. at 720, 602 A.2d at 1209, quoting *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 410, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410, 421 (1988). Thus, "mere parallelism between the facts and issues to be addressed under a state law claim and those to be addressed under § 301 does not render the state law analysis dependent on the labor contract." *Batson,* 325 Md. at 720, 602 A.2d at 1209.

When Giant initially was sued, it removed the case to federal court, asserting that Section 301 mandated federal preemption. Judge Deborah Chasanow of the United States District Court for the District of Maryland remanded the case to the Circuit Court for Prince George's County and concluded that Ms. Taylor's claims of discrimination and retaliatory discharge were not preempted by Section 301. *See Taylor v. Giant,* No. DKC 2004–0710, slip op. at 21, 2004 WL 2191715 (D.Md. Sep. 13, 2004). She put the question of the appropriateness of the federal forum in the context of whether the collective bargaining agreement between Local 639 and Giant was "central" to Ms. Taylor's claims, which would require preemption, or whether interpretation of the agreement was only "tangential" to her claims, which would permit consideration in state court. Regarding the discrimination claim, Judge Chasanow determined that, whether white, male employees were treated differently than Ms. Taylor was a "purely factual question" that did not require an interpretation of the collective bargaining agreement. She also concluded that Ms. Taylor's retaliation claim required no interpretation of the collective bargaining agreement and therefore Section 301 did

not apply. Rejecting Giant's claim that Article 10 of the collective bargaining agreement, which permitted Giant to discharge an employee for "good cause," was central to Ms. Taylor's retaliation claim, Judge Chasanow reasoned that the issue was not "whether Defendant may discharge an employee for good cause, but whether Defendant's alleged good cause was 'manufactured[ ] and orchestrated' . . . for the purpose in retaliation." *Taylor*, No. DKC 2004–0710, slip op. at 14.

The Court of Special Appeals, however, reached the opposite conclusion regarding federal preemption, reasoning that Ms. Taylor's theory of the case was "fluid and often elusive," appearing at times to call into question Giant's authority to require an independent medical examination in addition to a D.O.T. physical, under the collective bargaining agreement. *Giant*, 188 Md.App. at 28, 981 A.2d at 16. Our colleagues on the Court of Special Appeals concluded that Giant's authority to require an independent medical examination was "not a matter of application of the words of that section of the CBA," but a "matter of interpretation of the meaning of those words." *Id.* at 29, 981 A.2d at 17.

Before us, of course, Ms. Taylor disputes that her discrimination claim presents an interpretation of Article 22.7 of the collective bargaining agreement, but merely an inquiry into the application of that provision. In so doing, Ms. Taylor relies upon *Lingle*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410, a case in which the Supreme Court held that a state law retaliatory discharge claim was *not preempted* by Section 301 of the Labor–Management Relations Act. Giant responds that *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206, 216 (1985), a case in which the Supreme Court held that a state tort action for bad-faith handling of insurance claims *was preempted* by Section 301, is controlling.

In *Lingle*, the issue involved whether a manufacturer terminated the employment of an individual for seeking worker's compensation. The Supreme Court determined that Section 301 of the Labor–Management Relations Act did not preempt

state law remedies, unless the resolution of the claim "depend[ed] upon the meaning of a collective-bargaining agreement." *Id.* at 405–06, 108 S.Ct. at 1881, 100 L.Ed.2d at 418–19. The Court added that "not every dispute . . . tangentially involving a provision of a collective bargaining agreement, is preempted by § 301," such as provisions governing rate of pay and economic benefits relevant to the calculation of damages. *Id.* at 413 n. 12, 108 S.Ct. at 1884 n. 12, 100 L.Ed.2d at 423 n. 12, quoting *Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911, 85 L.Ed.2d at 215. The Court concluded that Ms. Lingle's state law remedy was " 'independent' of the collective bargaining agreement," because the merits of her claim did not turn on an interpretation of the contract. *Id.* at 407, 108 S.Ct. at 1882, 100 L.Ed.2d at 419; *see also Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93, 110 (1994) ("when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished. . . .").

In *Lueck,* Roderick Lueck suffered a non-occupational back injury, submitted a disability claim with his health insurer, Aetna, and began receiving benefits that were subject to interception by his employer, Allis–Chalmers, which precipitated Mr. Lueck's suit in state court in which he alleged that Allis–Chalmers had " 'intentionally, contemptuously, and repeatedly failed' to make disability payments under the negotiated disability plan, without a reasonable basis for withholding the payments," and thus, had "breached their duty 'to act in good faith and deal fairly with [Lueck's] disability claims.' " *Lueck,* 471 U.S. at 206, 105 S.Ct. at 1908, 85 L.Ed.2d at 212. Addressing Section 301 of the Labor–Management Relations Act, the Court instructed that if "the state tort law purports to define the meaning of the contract relationship, that law is pre-empted." *Id.* at 213, 105 S.Ct. at 1912, 85 L.Ed.2d at 216–17. The Court observed that, in Wisconsin, the tort of bad faith handling of an insurance claim "intrinsically relate[d] to the nature and existence of the contract," rendering the

"duties imposed and rights established through the state tort" wholly derivative from "the rights and obligations established by the contract." *Id.* at 216–17, 105 S.Ct. at 1914, 85 L.Ed.2d at 218–19. In so interpreting, the Court held that Section 301 of the Labor–Management Relations Act preempted Mr. Lueck's state tort claim.

In a case markedly similar to the case at bar, the United States Court of Appeals for the Fourth Circuit dealt with the same dichotomy. In *Martin Marietta Corp. v. Maryland Commission on Human Relations,* 38 F.3d 1392 (4th Cir. 1994), Martin Marietta, a party to several collective bargaining agreements, sought to enjoin administrative proceedings undertaken by the Maryland Commission on Human Relations relative to a claim of discrimination filed by Franklin Price, pursuant to Article 49B of the Maryland Code. Martin Marietta petitioned the United States District Court for the District of Maryland, unavailingly, to enjoin the proceedings on grounds that Section 301 of the Labor Management Relations Act preempted Mr. Price's claims. The Fourth Circuit affirmed the denial of the injunction, observing that, while the collective bargaining agreements at issue contained provisions relating to "absence from work due to a work-related injury, as well as procedures for dispute resolution," Article 49B provided both the "right to be free from handicap discrimination and a right to reasonable accommodation," each of which were rights independent of the collective bargaining agreements. *Id.* at 1399. The Fourth Circuit concluded that it "seemed likely that Price's handicap discrimination claim involve[d] no real issue of interpretation of the CBAs." *Id.; see also Owen v. Carpenters' District Council,* 161 F.3d 767, 776 (4th Cir.1998) ("In *Lingle's* wake, we have held that state law claims of handicap discrimination, retaliation, and intentional infliction of emotional distress are not preempted by § 301 of the LMRA ... because the claims involved purely factual questions concerning the conduct of the employee and the conduct and motivation of the employer, and because no

interpretation of the collective bargaining agreement was required.").

We also have had occasion to address the *Lingle–Lueck* distinction in *Batson*, 325 Md. at 684, 602 A.2d at 1191. In *Batson*, A. Spencer Shiflett, a former president of Local of the Industrial Union of Marine and Shipbuilding Workers of America, brought suit against the national union as well as two of its representatives for defamation, intentional infliction of emotional distress, and conspiracy, arising from the union's campaign to remove Mr. Shiflett from Office by alleging embezzlement and misappropriation of union funds. After the jury returned a verdict in favor of Mr. Shiflett on all counts, the union representatives appealed, asserting, among other claims, that Mr. Shiflett's state law claims were preempted by Section 301 of the Labor–Management Relations Act. Specifically, the national union representatives asserted that Mr. Shiflett's claims implicated a provision in the Union's Constitution and Bylaws that "prohibit[ed] the Local from entering any collective bargaining agreement without the consent of the National Union." *Id.* at 718, 602 A.2d at 1208. This Court, however, rejected the preemption claim, reasoning that Mr. Shiflett's "claims of libel, slander, and intentional infliction of emotional distress [were] rights that exist[ed], under Maryland law, independent of any provision of the National Union's Constitution or By-laws." *Batson*, 325 Md. at 721, 602 A.2d at 1210.

In the instant case, Giant alleges that it had the authority to request an independent medical examination under the terms of Article 22.7 of the collective bargaining agreement, which provides, in pertinent part:

> The Company shall not prohibit an employee with a current valid D.O.T. card from working unless the Company has reasonable cause to believe the employee has a physical or mental condition which necessitates that he be reexamined.

Whether Giant had the authority to order an independent examination of Ms. Taylor, or the requisite "reasonable cause" to require an independent medical examination, how-

ever, are not in issue.[11] Rather, the issue, which was tested at trial, was whether Giant's *motivation* in demanding the independent medical examination was in some way animated by Ms. Taylor's race or gender. Nowhere in Ms. Taylor's Second Amended Complaint does she allege that Giant somehow breached the terms of the collective bargaining agreement in requiring her, as opposed to her male counterparts, to undergo an independent medical examination. Rather, as the Second Amended Complaint lucidly states, Ms. Taylor

---

**11.** Giant has identified various cases, both reported and unreported, in which federal courts have held that state law claims were preempted by Section 301 of the Labor–Management Relations Act. The cases are inapposite, however, because, unlike the instant case, they all involved some iteration of a *breach* of a collective bargaining agreement. *See Batista v. Stewart Enterprises, Inc.*, 126 Fed.Appx. 767, 769 (9th Cir. 2005) (plaintiff argued that his former employer breached its progressive discipline policy, which incorporated terms from a collective bargaining agreement, in order to prove that he was fired because of his age); *Audette v. International Longshoremen's and Warehousemen's Union*, 195 F.3d 1107, 1112 (9th Cir.1999) (observing that, in order for the plaintiff to prove a breach of the settlement agreement, the court had to determine if the collective bargaining agreement was breached, "as the complaint itself indicate[d]."); *Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 27 (1st Cir.1997) (inquiry into whether an employer breached its duty to "provide a suitable hygienic environment" for a drug examination necessarily required a determination as to whether the terms of a collective bargaining agreement were breached); *Reece v. Houston Lighting & Power Co.*, 79 F.3d 485, 487 (5th Cir.1996) (allegations of discrimination in promotion, seniority and assignment to training programs involved interpretation of collective bargaining agreement); *Davis v. Johnson Controls, Inc.*, 21 F.3d 866, 868 (8th Cir.1994) (former disabled employee's disability discrimination claim, which alleged employer failed to reasonably accommodate disability by transferring plaintiff to another position, required interpretation of the seniority provisions of a collective bargaining agreement); *Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111, 113–15 (1st Cir.1988) (whether a drug test violated a plaintiff's reasonable expectation of privacy necessarily entailed a determination as to whether a collective bargaining agreement's " 'reasonable' rules and regulations" provision was breached); *see also Braxton v. Dillon Companies, Inc.*, 9 Fed.Appx. 919, 922 (10th Cir.2001) (claims that termination was based on factors covered by a collective bargaining agreement were preempted Section 301); *Fant v. New England Power Service Co.*, 239 F.3d 8, 16 (1st Cir.2001) ("Fant virtually invited this preemption conclusion in his complaint, where he alleged that the treatment constituting the substance of his grievance 'was in violation of the Collective Bargaining Agreement entered into by and between the defendants' ").

was alleging that Giant's "request that Taylor take an IME was discriminatory, as it did not require its Caucasian or male drivers who were in the same or similar situation to take an IME." It was clearly the application of the independent medical examination provision that was in issue, because Ms. Taylor's allegations of race and sex discrimination turned, not upon the meaning of Article 22.7, but Giant's design in invoking it.

■ With respect to Ms. Taylor's retaliation claim, we also disagree with Giant's assertion that Article 10 of the collective bargaining agreement, which permits an employee to be discharged for "good cause," required preemption. Here, as with Ms. Taylor's discrimination claim, the merits turned on Giant's motivations for firing Ms. Taylor, not whether Giant breached Article 10 of the collective bargaining agreement by firing her, as illustrated by Ms. Taylor's Second Amended Complaint:

> 113. Approximately, twenty-two (22) days after Plaintiff filed her first Charge of Discrimination with the PGHRC against Defendant, Giant on February 28, 2003 relieved Plaintiff of her duties as tractor-trailer driver unless she submitted to an IME under the guise that it was "concerned" about Plaintiff's safety.
>
> \*　　\*　　\*
>
> 115. Defendant's actions associated with terminating Plaintiff's employment and the grievance proceedings were used to retaliate against plaintiff.

Under these circumstances, Ms. Taylor's retaliation claim was "independent of the collective-bargaining agreement," and thus, not preempted. *Lingle,* 486 U.S. at 407, 108 S.Ct. at 1882, 100 L.Ed.2d at 419 (instructing that a retaliatory discharge claim presents "purely factual questions pertain[ing] to the conduct of the employee and the conduct and motivation of the employer," neither of which "requires a court to interpret any term of a collective bargaining agreement").

Our colleagues on the Court of Special Appeals, however, determined that the issue Ms. Taylor presented was whether Giant had the authority to order an independent medical

examination, based on evidence adduced at trial. The issue of preemption, however, is not dependent upon evidence adduced at trial, but upon what is alleged as the focus in the discrimination claim. *See Vera v. Saks & Co.*, 335 F.3d 109, 113–14 (2d Cir.2003). As we have discussed, neither Ms. Taylor's discrimination nor her retaliation claims alleged breaches of the collective bargaining agreement, so that federal preemption did not arise.

■ In addressing Ms. Taylor's sex discrimination claim, we must clarify the appropriate legal standard for comparator evidence as it relates to adverse employment actions, an issue of first impression in this Court. *See Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins, LLC*, 412 Md. 308, 314, 987 A.2d 48, 52 (2010) ("[O]ur review [of a purely legal question] is non-deferential to the judgments of the intermediate appellate court and the trial court.").

Ms. Taylor's claim of disparate treatment emanated from Section 2–222 of the Prince George's County Code, which stated:

> No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination.

Prince George's County Code (2003), Section 2–222. The umbrella provision, of course, for her claim was Section 42 of Article 49B of the Maryland Code, which provided, in pertinent part:

> (a) *Authorized.*—In Montgomery County, Prince George's County, and Howard County, in accordance with this subtitle, a person who is subjected to an act of discrimination prohibited by the county code may bring and maintain a civil action against the person who committed the alleged discriminatory act for damages, injunctive relief, or other civil relief.

Maryland Code (1957, 2003 Repl.Vol.), Section 42 of Article 49B.

In proving her claim of disparate treatment, Ms. Taylor utilized evidence regarding four male truck drivers at Giant with significant health problems, none of whom was required to undergo an independent medical examination. Our colleagues on the Court of Special Appeals, however, determined that Ms. Taylor's evidence was "not such as to allow any reasonable fact-finder to conclude that Taylor was treated differently—that is, required to undergo an IME by a Giant-specified doctor for a condition not covered by a DOT physical—than similarly situated male employees at all, let alone on the basis of gender." *Giant,* 188 Md.App. at 38, 981 A.2d at 23. In attempting to overcome the decision of the Court of Special Appeals regarding comparator evidence, Ms. Taylor asserts that the intermediate appellate court "created new evidentiary standards which are at odds with existing law and will be impossible to achieve." Giant contends, however, that the male comparator evidence was inapposite, because an independent medical examination was unnecessary to monitor their condition.

In addressing the issue of appropriate comparator evidence, we recognize the dearth of our own jurisprudence on this issue, as well as our history of consulting federal precedent in the equal employment area. *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 481, 481 n. 8, 914 A.2d 735 (2007) ("Title VII is the federal analog to Article 49B of the Maryland Code" and "our courts traditionally seek guidance from federal cases in interpreting Maryland's Article 49B"). Federal courts have permitted plaintiffs to prove discrimination with circumstantial evidence by demonstrating that "similarly situated individuals outside the[ir] protected class were treated more favorably." *Benuzzi v. Bd. of Educ.,* 647 F.3d 652, 662 (7th Cir.2011). Under some circumstances, circumstantial evidence has been deemed "more certain, satisfying and persuasive than direct evidence." *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 299–300 (4th Cir.2010), quoting *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

In *Merritt,* 601 F.3d at 289, the Fourth Circuit recognized that an employer's differing treatment of the ailments of members of the opposite sex may support a gender discrimination claim, even where the circumstances surrounding the ailments were not identical. In *Merritt,* a female truck driver for Old Dominion Freight Line, Inc., had been required to take a "physical ability test," or PAT, before returning to work after an ankle injury; similarly situated male drivers were not required to do so. After she was terminated for having not passed the PAT, Ms. Merritt filed a gender discrimination suit on a disparate treatment theory, which the trial court disposed of on summary judgment. The Fourth Circuit reversed, however, observing, among other things, that Ms. Merritt had put forth evidence that two "male drivers missed work as a result of an injury," but, "[u]nlike Merritt, both men were allowed to return to their full duties without passing a PAT." *Merritt,* 601 F.3d at 298. The male drivers, significantly, did not have ankle injuries, but did have injuries that could affect their performance: one male driver underwent a hernia operation and missed six months of work, while the other male driver missed work due to an injured shoulder. The Fourth Circuit emphasized that "[b]y utilizing the PAT to assess the physical qualifications of Merritt but not males similarly situated to her, [Old Dominion] could be seen by a jury to embrace beliefs that women are unsuited for some of the more remunerative forms of manual labor and, once injured, are less resilient in their ability to recover." *Id.* at 300; *see also Freeman v. Madison Metropolitan School District,* 231 F.3d 374, 383 (7th Cir.2000) (African American janitor with permanent knee injuries was not required to produce Caucasian employee with exact same ailment; a Caucasian worker with a temporary back injury was sufficient to survive employer's motion for directed verdict); *Eaton,* 657 F.3d at 556 (instructing that courts should refrain from applying comparator evidence "so rigidly or inflexibly that it [becomes] a useless analytical tool," quoting *Silverman v. Board of Education,* 637 F.3d 729, 742 (7th Cir.2011)); *Chaney v.*

*Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir.2010) (comparator need not be a clone, only "substantially similar").

Further, relevant to the singularity of gender-specific ailments, the Third Circuit Court of Appeals has considered how a company treated employees of the opposite sex with dissimilar health conditions to determine that a woman was treated adversely when she had an abortion. In *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358 (3d Cir.2008), the treatment of Jane Doe, a female employee who suffered complications during a pregnancy and ultimately, had to terminate her pregnancy, was compared with the treatment of male employees with health conditions unrelated to their gender. During Ms. Doe's absence, because of the abortion, Ms. Doe failed to call in, and she was fired.

In her Title VII case, Ms. Doe claimed that male employees with health-related absences were not fired for failing to abide by the call-in policy. The district court granted the employer's motion for summary judgment, reasoning that Ms. Doe had failed to establish a *prima facie* case of gender discrimination. The Third Circuit reversed, observing that two male employees had not been subjected to adverse employment action for failing to call in when they were ill from a heart attack and a psychiatric problem. *Doe,* 527 F.3d at 366–67; *see also Strickland v. United Parcel Service, Inc.,* 555 F.3d 1224, 1231 (10th Cir.2009) (concluding that Ms. Strickland's gender discrimination claim was not defeated "as a matter of law," because the record reflected "that she was treated worse than her male co-workers").

Giant asserts, however, that Ms. Taylor's comparator evidence is insufficient nonetheless, because she did not have the same supervisor as her male counterparts, that none of the male comparators sought exemption from Giant's call-in policy due to their ailment, and that the male comparators had submitted a certification from their private doctors that it was safe for them to return to work. Ms. Taylor asserts that none of these distinguishing facts, in themselves, renders her discrimination claim insufficient as a matter of law, because all

the comparators had serious health conditions that did not trigger an independent medical examination.

█ It is clear that one who alleges discrimination need not identify and reconcile every distinguishing characteristic of the comparators. In *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008), for instance, in the context of an age discrimination suit, the Supreme Court of the United States addressed whether testimony of co-workers that were subjected to discrimination by supervisors other than that of the plaintiff could be relevant to the discrimination inquiry. The Court instructed that the relevance of evidence that other supervisors engaged in discriminatory conduct "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* at 387, 128 S.Ct. at 1147, 170 L.Ed.2d at 9.

In *Chaney v. Plainfield Healthcare Center*, 612 F.3d at 908, Brenda Chaney, an African American nurse aide, was fired after only three months of working at Plainfield Healthcare Center, allegedly because she had used profanity and delayed in responding to a patient's call for assistance. Ms. Chaney filed a Title VII racial discrimination claim, alleging that she had been fired, not because she used profanity, but because some patients at Plainfield may have preferred not to have a black nurse aide. The district court granted Plainfield's motion for summary judgment and the Seventh Circuit reversed, in part, because Ms. Chaney had produced evidence that a Caucasian aide that had not been fired, despite having failed to timely respond to a bed alarm and assist a patient in need of emergency assistance. The Third Circuit acknowledged that, "unlike Chaney, Hart was not accused of using profanity in front of a resident," but went on to instruct that "the similarly situated coworker inquiry is a search for a *substantially similar employee, not for a clone.*" *Id.* at 916 (emphasis added). In determining that a reasonable jury could conclude that Plainfield had discriminated against Ms. Chaney, the court reasoned if "failing to respond to a bed alarm is a

separate, terminable offense, it is suspicious that Hart . . . got off without so much as a warning." *Id.*

In *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827 (7th Cir.2007), moreover, a Palestinian Arab was denied renewal of his franchise agreement with Dunkin' Donuts after he declined to sell breakfast items containing pork. Mr. Elkhatib filed a racial discrimination claim, which the district court disposed of on summary judgment. The Seventh Circuit reversed, in part, because Mr. Elkhatib had identified three other Dunkin' Donuts franchises that had "refused to carry the full line of breakfast sandwiches." *Id.* at 831. The court rejected Dunkin' Donuts's contention that Mr. Elkhatib's comparators were insufficient because of various distinguishing factors, to include: that none of the comparators were Arab, the first comparator's reason for not carrying breakfast item was related to a condition of his commercial lease, the second comparator's reason for not carrying breakfast items was lack of space, and the third comparator's reason for not carrying pork products was to "meet the demand in the area for a kosher establishment." *Id.* The court concluded that, while Mr. Elkhatib's comparators all had distinguishing characteristics, they had an important one in common, that being: they did not comply with Dunkin' Donuts requirement that a full line of breakfast products be served, yet none were denied a renewal of their franchise agreement like Mr. Elkhatib was.

In the instant case, the record reveals that all four of Ms. Taylor's male comparators were afflicted with serious health problems, including Diabetes, Parkinson's Disease, and severe dizziness, but none was required to undergo an independent medical examination, while Ms. Taylor *was,* for a gynecological problem. Were we to adopt the approach Giant advocates and require Ms. Taylor to produce a comparator with a gender-specific ailment that escaped the attention of DOT physicals, yet was not subjected to an independent medical examination, we would essentially be eradicating disparate treatment based on gender-specific ailments as an actionable form of discrimination altogether.

Giant, though, suggests that an unpublished opinion of the Third Circuit, *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220 (3d Cir.2009), in which an individual's Title VII disciplinary discrimination claims failed at the summary judgment stage, should control. The *Opsatnik* decision, Giant claims, supports the Court of Special Appeals conclusion that Ms. Taylor's comparators were not similarly situated because of having different supervisors. *Opsatnik*, however, relying on the Supreme Court's decision in *Mendelsohn*, 552 U.S. at 379, 128 S.Ct. at 1140, 170 L.Ed.2d at 1, identified having the same supervisor as one consideration regarding similarly situated, among many. In *Opsatnik*, a Caucasian male, Jeffrey Opsatnik, was fired from his position as a locomotive engineer at Norfolk Southern for a record of misconduct up to and including his failure to reduce the speed of a train in operation to below 40 miles per hour in "observance of weather-related speed restrictions." *Id.* at 221. Mr. Opsatnik filed a Title VII suit alleging that similarly situated African American, female, as well as younger employees had not been terminated for similar misconduct.

The trial court granted Norfolk Southern's motion for summary judgment, and the Third Circuit affirmed. The Third Circuit instructed that the sufficiency of comparator evidence is "*determined by the context of each case*, but often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik*, 335 Fed.Appx. at 223 (emphasis added) (internal citations omitted). Further, the Third Circuit clarified that "there can be no *per se* rule that comparator evidence from employees with different supervisors is irrelevant." *Id.* Applying a contextual approach, the Third Circuit concluded that Mr. Opsatnik had not adduced sufficient comparator evidence because the comparators did not work in the same division, have speed violations or have as many infractions.

Giant also insists that Ms. Taylor's comparator evidence fails because the male drivers did not ask to be exempted from Giant's call-in policy and because some male drivers were permitted to return to work after obtaining a certification from their private doctors. To embrace Giant's reasoning, however, would encourage courts to parse out every individual aspect and employment factor, rather than consider the single most relevant fact, that each of the male drivers used as comparators had significant health conditions but were not required to submit to an independent medical examination.

In this case, we also must determine whether legally sufficient evidence was adduced to support the jury verdict that Giant terminated Ms. Taylor's employment in retaliation for having filed a discrimination claim with the Prince George's County Human Relations Commission. In order to make this determination, "we must view the evidence, and the inferences reasonably deducible from the evidence, in a light most favorable to [the plaintiff], looking only to whether, viewed in that manner, it was legally sufficient to create a triable issue." *Georgia–Pacific Corp. v. Pransky,* 369 Md. 360, 364, 800 A.2d 722, 724 (2002).

In *Manikhi v. Mass Transit Administration,* 360 Md. 333, 758 A.2d 95 (2000), in the context of a retaliation claim arising from the internal reporting of sexual harassment, we stated that the pleading requirements for a retaliation claim were that the employee: (1) "engaged in a statutorily protected expression or activity;" (2) "suffered an adverse employment action by her employer;" and (3) "there is a causal link between the protected expression and the adverse action." *Id.* at 349, 758 A.2d at 103–104, quoting *Knox v. Indiana,* 93 F.3d 1327, 1333–34 (7th Cir.1996). In *Ruffin Hotel Corp. v. Gasper,* 418 Md. 594, 17 A.3d 676 (2011), another retaliation case predicated on a report of sexual harassment, we clarified that an employee must merely adduce evidence that their protected activity was a "motivating factor" in an employer's decision to subject them to an adverse employment action, not necessarily the controlling factor. *Id.* at 614, 17 A.3d at 687.

The specific element that is in question is whether Ms. Taylor adduced sufficient evidence of a causal link between her discrimination claim and Giant's termination of her employment. Ms. Taylor argues that the Court of Special Appeals's decision effectively renders it impossible for her or anyone in her position to prove retaliation through circumstantial evidence, because Giant employees' denials of knowledge of the filing of her claim was accepted as dispositive by the Court of Special Appeals. Giant responds that Ms. Taylor failed to show that the individual decision-makers involved in her discharge on February 28, 2003, Mr. Weiss and Ms. Smith, knew that Ms. Taylor had filed a discrimination claim at the time the decision was made.

In the present case, Ms. Taylor adduced solely circumstantial evidence to prove Giant knew of the discrimination claim. The distinction between direct evidence of knowledge and circumstantial evidence is oftentimes at the heart of a retaliation case, as exemplified by the Seventh Circuit's discussion in *Sylvester v. SOS Children's Villages,* 453 F.3d 900 (7th Cir.2006). In *Sylvester,* Rosemary Sylvester, an employee of a foster home association, SOS Children's Villages, filed a Title VII discrimination and retaliation claim against Job West, the CEO of SOS, after Ms. Sylvester was fired, she claimed, for having reported Mr. West's sexually discriminatory remarks in a letter to SOS's board, which three of her fellow employees had signed. After receiving the letter, two signatories of the letter, excluding Ms. Sylvester, were fired for poor job performances. At a later SOS board meeting, Ms. Sylvester's job performance was discussed, even though she had recently received a positive performance evaluation. Immediately after her colleagues' firing were announced, Ms. Sylvester also met with Mr. West, after which Ms. Sylvester was fired for insubordination. The district court granted summary judgment to SOS on Ms. Sylvester's retaliation claim. The Seventh Circuit reversed. The court's exploration of the evidentiary aspects of a retaliation claim elucidates various evidentiary considerations:

The plaintiff's claim that she was retaliated against ... for opposing sex discrimination in the form of sexual harassment depends entirely on circumstantial evidence; and we must first consider whether and in what sense such evidence can be used to prove retaliation (or other forms of discrimination, but we confine our discussion to retaliation). The usual way in which a plaintiff tries to establish a prima facie case (that is, a case strong enough to withstand summary judgment for the defendant) of retaliation is by an adaptation of the *McDonnell Douglas* test.... [T]his "requires the plaintiff to show that after filing the charge [or otherwise opposing the employer's allegedly discriminatory practice] only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." This method of establishing a prima facie case requires proof both of similarly situated employees and of the plaintiff's performing his job satisfactorily.

This method is called "indirect"; the alternative—the "direct"—method of establishing a prima facie case of retaliation requires the plaintiff "to present direct *evidence* (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and *as a result* suffered the adverse employment action of which he complains." This method is ordinarily more onerous because of the phrase that we have italicized, but it is the plaintiff's only recourse if he (in this case she) cannot prove that a similarly situated employee who did oppose the employer's practice was not fired or otherwise treated as badly as the plaintiff was.

Read literally, the passage just quoted ... would defeat Sylvester's use of the "direct" method because the passage says that the method requires "direct evidence," defined in the passage as "evidence that establishes [a proposition] without resort to inferences from circumstantial evidence." This is a misleading dictum. What is true is that the direct method does not utilize the specific circumstantial evidence

that the plaintiff presents when he uses the indirect method of establishing discrimination. But if he can prove by means of circumstantial evidence "that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains," that is fine, as most of our cases ... properly assume.

The distinction between direct and circumstantial evidence is vague ... but more important it is irrelevant to assessing the strength of a party's case. From the relevant standpoint—that of probative value—" 'direct' and 'circumstantial' evidence are the same in principle."

The conventional distinction is that direct evidence is testimony by a witness about a matter within his personal knowledge and so does not require drawing an inference from the evidence (his testimony) to the proposition that it is offered to establish, whereas circumstantial evidence does require drawing inferences. By that standard, even a documentary admission is circumstantial evidence, because the genuineness of the document must be inferred before the admission can be credited. But actually all evidence, even eyewitness testimony, requires drawing inferences; the eyewitness is drawing an inference from his raw perceptions. "All evidence is probabilistic, and therefore uncertain; eyewitness testimony and other forms of 'direct' evidence have no categorical epistemological claim to precedence over circumstantial or even explicitly statistical evidence." Perhaps on average circumstantial evidence requires a longer chain of inferences, but if each link is solid, the evidence may be compelling—may be more compelling than eyewitness testimony, which depends for its accuracy on the accuracy of the eyewitness's recollection as well as on his honesty.

A residual suspicion of circumstantial evidence in discrimination (including retaliation) cases is perhaps reflected in the frequent references in decisions of this court to "a convincing mosaic of circumstantial evidence" as an alternative "direct" method to direct evidence of establishing the

prima facie case. The phrase first appeared . . . to describe the "kind of circumstantial evidence . . . that consists of ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." A mosaic is a work of visual art composed of a large number of tiny tiles that fit smoothly with each other, a little like a crossword puzzle. A case of discrimination can likewise be made by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction: "a number of weak proofs can add up to a strong proof."

*Id.* at 902–03 (citations omitted). Thereafter, the court enumerated several pieces of circumstantial evidence that buttressed Ms. Sylvester's claim of retaliation: the fact that two signatories were promptly fired after drafting the letter despite their having poor work records for a substantial period of time, Ms. Sylvester's job performance being discussed, although she had "no current performance issues," by the SOS board after she signed the letter, and the fact that Mr. West was authorized to fire Ms. Sylvester for reacting to the firing of the two co-signatories, not poor job performance. *Id.* at 905.

In *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531 (6th Cir.2008), Dennis Imwalle, the former President of Reliance Medical Products, was terminated from his position three months after he filed complaints for age and national-origin discrimination with the EEOC. Thereafter, he filed suit, alleging various discrimination and retaliation claims. At trial, Mr. Imwalle adduced evidence that he experienced an "atmosphere of retaliation" at Reliance Medical Products, that he was "more or less divorced from the activities" of his company, and that " 'key decisions' were made 'without his input or knowledge.' " *Id.* at 541. The jury returned a verdict in favor of Mr. Imwalle, and Reliance Medical Products appealed, arguing,

among other things, that Mr. Imwalle failed to adduce legally sufficient evidence to support the jury verdict. The Court of Appeals for the Sixth Circuit affirmed the jury verdict, reasoning that Mr. Imwalle's circumstantial evidence, which included his own testimony "about the retaliatory atmosphere he experienced following his complaints," and the relatively close three-month interim between his complaints and his termination, taken together in the light most favorable to Mr. Imwalle, would not lead "reasonable minds" to the one conclusion that Mr. Imwalle's complaints were not a motivating factor in his termination. *Id.* at 550–51; *see also Moore v. KUKA Welding Systems,* 171 F.3d 1073, 1080 (6th Cir.1999) (evidence that, after the plaintiff filed an EEOC complaint, he became increasingly isolated at work, experienced more disciplinary writeups for trivial matters, and received "unwarranted criticism" of his work product, "viewed as a whole" supported the jury's finding of retaliation).[12]

In *Pickett v. Sheridan Health Care Center,* 610 F.3d 434 (7th Cir.2010), Danielle Pickett, worked for Sheridan Health Care Center as a dietary aide and housekeeper. Over the course of her employment, Ms. Pickett informed her superiors on several occasions that residents at the Sheridan had made lewd remarks and touched her inappropriately. One day, after a heated conversation about the inappropriate behavior of certain residents with a supervisor, Ms. Pickett left work in tears. Later, after her supervisors conferred with Ms. Pickett and suggested that she "part ways" with the company, Sheridan formally discharged Ms. Pickett for leaving the work premises while on the clock. *Id.* at 442. Ms. Pickett sued for retaliatory discharge, and the jury returned a verdict in her favor. Sheridan appealed the verdict on grounds it was not supported by sufficient evidence. The Seventh Circuit af-

---

**12.** Giant relies on *Baqir v. Principi,* 434 F.3d 733 (4th Cir.2006), for its argument that Ms. Taylor failed to show the knowledge component is misplaced. In *Baqir,* the plaintiff failed to adduce *any* evidence, direct or circumstantial, that his employer knew he filed a discrimination claim or from which a rational fact finder could infer knowledge. Such is not the case here.

firmed, reasoning that "a finding that appellant was fed up with Pickett for impermissible reasons (frustration with the steady stream of Pickett's protected requests to curtail what she believed to be sexual harassment) and was waiting for an excuse to get rid of her would explain" why, the day before she was fired, she went from showing up to her job ready to work "to tearfully pleading to hold on to her job ... all *before* walking out of the Center." *Id.* at 442. The court concluded that, because Ms. Pickett was already under the impression that she had been fired prior to Sheridan's formal notice of discharge and her supervisors suggested that she "part ways" with the company, a reasonable juror could have been suspicious "about whether the sudden departure of an otherwise well-performing employee would lead to automatic termination." *Id.; see also Polk v. Yellow Freight System, Inc.,* 876 F.2d 527, 531 (6th Cir.1989) (there was sufficient evidence of retaliation where plaintiff, Ms. Polk, proved that a superior stated, "I know where you've been" to Ms. Polk after she visited the Michigan Department of Civil Rights, and she was fired one day later).

The record reflects that, after Ms. Taylor filed her discrimination complaint with the Prince George's County Human Relations Commission on February 3, 2003, the Commission mailed a notice to Mr. Garrett, an officer in Giant's Office of Fair Employment, which he testified as having received on February 7, 2003. Mr. Garrett testified that, as of February 20, 2003, he had communicated with the Commission regarding Ms. Taylor's discrimination complaint and had even attempted to mediate on behalf of Giant. Mr. Garrett had also been involved in Ms. Taylor's gynecological-related union grievances prior to the filing of the discrimination claim in question, attended at least one grievance hearing related to Ms. Taylor's condition at which Mr. Weiss was present, and had even been asked by Giant officials to perform his own research on Ms. Taylor's gender-related ailments. The jury was entitled to disbelieve the testimony of denial of notice by Mr. Weiss and Ms. Smith and embrace Ms. Taylor's circumstantial evidence of knowledge of the claim.

Finally, we address Ms. Taylor's challenge to the Court of Special Appeals's reversal of the trial court's award of attorney's fees to her, which was brought to us by a second petition for certiorari. She argues that the intermediate appellate court lacked jurisdiction to consider Giant's untimely filed appeal, which was filed more than 30 days after the trial court issued and entered its order granting her motion for attorney's fees, and thus was untimely filed under Rule 8–602.[13] We agree, for it is axiomatic that "a party in the trial court must file a timely notice of appeal, from an appealable judgment, in order to confer upon an appellate court subject matter jurisdiction over that party's appeal." *In re Nicole B.*, 410 Md. 33, 62, 976 A.2d 1039, 1055 (2009).

In reversing the Court of Special Appeals opinion, however, we are mindful that the intermediate appellate court did not reach a number of issues also raised by Giant in its appeal, which requires that we remand the case to the intermediate appellate court for consideration of the additional issues. *See New York Bronze Powder Co. v. Benjamin Acquisition Corp.*, 351 Md. 8, 23, 716 A.2d 230, 237 (1998) (remanding to Court of Special Appeals to consider additional issues it "saw no need to address" after disposing of case on other grounds); *State v. Wischhusen*, 342 Md. 530, 544, 677 A.2d 595, 601–02 (1996) (remanding to the Court of Special Appeals for consideration of the remaining issues which were raised before it, but that it did not address); *Institutional Management Corporation v. Cutler Computer Concepts, Inc.*, 294 Md. 626, 634–35, 451 A.2d 1224, 1228 (1982) (remanding to the Court of Special Appeals for the purpose of considering a remaining issue where it had

---

**13.** Rule 8–602 provides, in pertinent part:

> (a) Grounds. On motion or on it own initiative, the Court may dismiss an appeal for any of the following reasons:
>
>       \*     \*     \*
>
> (3) the notice of appeal was not filed with the lower court within the time prescribed by Rule 8–202.

Rule 8–202 provides, in pertinent part:

> (a) **Generally.** Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after the entry of the judgment or order from which the appeal is taken.

been raised, but not decided, by the intermediate court, and was not raised in a petition for writ of certiorari before the Court of Appeals).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY RESPONDENT. COSTS IN THE COURT OF SPECIAL APPEALS TO ABIDE BY THE RESULT.**